FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

OCT 13 2026

ERIK PALTROW
CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ARTHUR F. MURFIN,

Plaintiff,

v.

No. 1:25-cv-00664-JFR-JMR

UNITED STATES OF AMERICA, et al.,

Defendants.

**PLAINTIFF'S STATEMENT OF REASONS FOR REQUESTED DISCOVERY AND NOTICE OF DISCOVERY DISPUTE, SUBMITTED FOR THE OCTOBER 15, 2026 STATUS CONFERENCE**

Plaintiff Arthur F. Murfin, proceeding pro se, submits this Statement and the attached exhibits so that the Court and Defendants have in hand the documents Plaintiff may refer to if given the opportunity to speak at the status conference set for October 15, 2026. Plaintiff does not have electronic filing access and is submitting this Statement by mail.

On October 1, 2026, Defendants served their Responses to Plaintiff's First Request for Discovery (Requests for Production Nos. 1–5). Defendants objected to every request. For Request No. 4, Defendants also referred Plaintiff to the investigative file for EEO matter 8Y1M1901620, Bates-stamped Murfin 25-664 (USA) 001217–001746. (Ex. 2.)

This Statement is not itself a motion to compel. Its purposes are (1) to give notice that a discovery dispute exists; (2) to explain, request by request, why Plaintiff asked for these records; (3) to offer narrowed versions of the requests in good faith to address Defendants' breadth and burden objections; and (4) to ask the Court to address at the conference how the dispute should proceed, including the 21-day period under D.N.M.LR-Civ. 26.6, which would otherwise run on or about October 22, 2026.

## I. THE CLAIMS AND WHY THESE RECORDS MATTER

This action arises from Plaintiff's employment with the Department of the Air Force and his removal effective April 22, 2025. The Complaint asserts retaliation under Title VII, disability discrimination under the Rehabilitation Act, and retaliation under the Family and Medical Leave Act. The removal was proposed by Plaintiff's supervisor, Dan Ober, on a charge of "Conduct Unbecoming a Federal Employee," with specifications that included after-hours access to Building 570 and an open beverage in the machine shop. Plaintiff has also moved for leave to file a First Amended Complaint that adds factual allegations drawn from his records, including his communications with the Inspector General (Doc. 52). Defendants do not oppose that motion (Doc. 54).

The scope of discovery under Fed. R. Civ. P. 26(b)(1) is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." In a retaliation case, the central questions include what protected activity occurred, which officials knew about it, whether those officials had a motive to retaliate, and whether the stated reasons for discipline were applied evenhandedly or were pretext. The records Plaintiff requested go to those questions. Plaintiff is not asking to try a separate safety case. He is asking for records that show the history of his reports to Air Force officials, who knew of them, and how the same officials responded to safety matters within their own responsibility.

Many of these records are in Defendants' exclusive possession. Plaintiff is a former employee with no access to Air Force email systems, safety-office files, or investigative files. Under Rule 26(b)(1), "the parties' relative access to relevant information" is part of the proportionality analysis.

## II. REASONS FOR EACH REQUEST AND PROPOSED NARROWING

**Requests Nos. 1 and 2 — Plaintiff's July 17, 2013 Safety Disclosure to Rick Buhl (Hill Air Force Base)**

**What was requested:** Records of Plaintiff's July 17, 2013 safety disclosure to Rick Buhl about beryllium-copper machining at Hill Air Force Base, and records identifying Mr. Buhl's role and what was done with the disclosure.

**Defendants' objection:** Overly broad, unduly burdensome, and irrelevant because the disclosure predates the employment at issue, occurred at a base in another state, and involves an individual Defendants say is unrelated to this case; Request No. 2's phrase "sufficient to identify" is vague.

**Why Plaintiff requested it:**

Plaintiff was an Air Force employee at Hill Air Force Base in 2013, and the Department of the Air Force is a Defendant here. Plaintiff's July 17, 2013 email (Ex. 3) is the earliest documented safety disclosure in his Air Force career. Plaintiff believes that adverse treatment by Air Force management began after that disclosure and continued after he moved to AFRL at Kirtland Air Force Base. Whether that disclosure was forwarded, logged, or discussed with other Air Force personnel — and whether any record of it reached the officials who later supervised or disciplined him — bears on knowledge, motive, and the credibility of the reasons given for his removal. Only Defendants can search the Air Force records that would show this.

Mr. Buhl was not an unrelated individual. He was the Director of the 309th Commodities Maintenance Group at Hill Air Force Base, and he answered Plaintiff in writing the next day, July 18, 2013. He wrote: "I appreciate you bringing this concern to me," "I will engage with the bio and medical community to look into this issue," and "I will get back to you next week on a proposed way ahead." (Ex. 3.) That reply shows that an Air Force manager

received the disclosure and said he would act on it. Any records of that follow-up, and of whom Mr. Buhl contacted, are exactly what Requests Nos. 1 and 2 seek.

Plaintiff's difficulties with the Air Force began before he arrived at Kirtland. The investigative file for EEO matter 8Y1M1901620 that Defendants produced contains emails showing that Plaintiff accepted a firm job offer for the Kirtland position on July 23, 2017, left his federal position at the U.S. Mint in San Francisco, and was told on Monday, August 7, 2017 — while in transit and during the period he understood to be administrative leave for his move — that the offer had been rescinded. The offer was restored only after Lieutenant Colonel Richard Reed intervened. (Ex. 6, ROI pp. 62, 101–107.) At the time, Plaintiff attributed the rescission to his age. He also believes his 2013 safety disclosure may have played a role. Requests Nos. 1 and 2 seek the records that would show whether Air Force personnel knew of that disclosure, which only Defendants can search.

**Metadata:**

Plaintiff does not seek metadata for all documents. He seeks it only for the few key emails identified in these requests, because the date and recipient information (who received, forwarded, or replied, and when) is the most direct evidence of who knew of his reports. Plaintiff believes this is the type of particularized need Defendants' own authority describes.

**Plaintiff's proposed narrowing:**

(a) Limit the time period to July 1, 2013 through December 31, 2017.

(b) Reword Request No. 2 to remove "sufficient to identify": "Documents showing Rick Buhl's position title and organization in July 2013, any record of what he did with Plaintiff's July 17, 2013 disclosure (including any forward, referral, or response), and Mr. Buhl's current position title and organization."

**Request No. 3 — Hill Air Force Base Beryllium-Copper Machining Records**

**What was requested:** Records concerning beryllium-copper machining at Hill Air Force Base, including exposure assessments, air sampling, controls, and any contact with National Jewish Medical and Research Center.

**Defendants' objection:** "The relevant period" is undefined; the request covers nearly every type of record; and the subject is unrelated to the Complaint.

**Why Plaintiff requested it:**

Plaintiff's July 2013 email specifically urged that National Jewish Medical and Research Center be consulted. Whether management assessed, substantiated, or dismissed his concern is relevant to how Air Force management viewed Plaintiff as a person who reported safety concerns. Plaintiff agrees that, as written, this request is broader than necessary and offers to narrow it substantially.

**Plaintiff's proposed narrowing:**

> Limit Request No. 3 to July 1, 2013 through December 31, 2017, and to: (i) any assessment, air sampling, inspection, or corrective action undertaken in response to Plaintiff's July 2013 concern; (ii) any contact with, or decision whether to contact, National Jewish Medical and Research Center about that concern; and (iii) documents showing whether Hill Air Force Base currently machines beryllium copper in the same manner, or whether any changes to procedures, controls, or equipment have been made since July 2013.

**Request No. 4 — Complete Report of Investigation, EEO Matter 8Y1M1901620**

**What was requested:** The complete investigative file for Plaintiff's Air Force EEO matter 8Y1M1901620, including exhibits, interview notes, investigator correspondence, transmittal records, and final-agency-decision materials.

**Defendants' response:** Defendants objected to part of the request as vague and to the last sentence as irrelevant, and referred Plaintiff to Bates pages Murfin 25-664 (USA) 001217–001746.

**Why Plaintiff requested it:**

Plaintiff's prior EEO complaint is protected activity and is central to his retaliation claim. In a November 1, 2021 email to Mr. Ober and Inspector General representative Dennis Lange, copied to Richard Parris and Erin Pettyjohn (Ex. 4), Plaintiff answered Mr. Ober's October 29, 2021 criticism of his work and wrote: "Both you and Tim have a problem with me because of that EEO complaint I files." In the same email he raised safety concerns ("you rely on Tim who breaks Safety rules") and possible fraud and abuse. Mr. Ober later proposed Plaintiff's removal. The complete EEO file bears directly on protected activity and management knowledge.

Defendants object to the last sentence of Request No. 4 on the ground that matter 8Y1M1901620 "contains no allegations of prior discrimination." The investigative file itself shows otherwise. It contains Plaintiff's August 24, 2017 email to Lieutenant Colonel Reed and the related July–August 2017 emails about the rescission of his job offer (ROI pp. 101–107); Plaintiff's sworn answers describing the rescission and stating that he believed his age and medical condition were factors, "a holdover from the problems when I first got here and was told the job was cancelled" (ROI pp. 62, 70); and the investigator's question to Dr. Caudill about that history (ROI p. 124). (Ex. 6.) The last sentence of Request No. 4 is therefore neither vague nor irrelevant.

Plaintiff appreciates Defendants' production of Bates pages 001217–001746. Plaintiff asks only that Defendants confirm whether that production is the complete file, and state whether any interview notes, investigator correspondence, transmittal records, or final-agency-decision materials exist and are being withheld. Plaintiff did not receive a final agency decision in that matter; if none was issued, a statement to that effect would resolve that part of the request.

**Request No. 5 — July 2021 Pressurized Hydrogen-Fluoride Bottle Incident (AFRL/RVB, Kirtland)**

**What was requested:** Records concerning the pressurized bottle described in Erin Pettyjohn's July 20, 2021 email, "Safety Mishap – Pressurized Bottle," including its origin, storage, the emergency response, and disposal, and the involvement of named officials.

**Defendants' objection:** "Sufficient to identify" is vague; the request is overly broad; and the bottle "appears to be unrelated" to this case, the Complaint, and the EEOC proceedings.

**Why Plaintiff requested it:**

This incident occurred at Plaintiff's own workplace, AFRL/RVB at Kirtland Air Force Base, during his employment. Ms. Pettyjohn's email (Ex. 5) reports that a pressurized bottle containing HF was discovered, that the Kirtland Fire Department and RV Safety assessed the situation with Colonel Felt, that personnel were sent home to telework until the lab was cleared, and that the bottle was placed in an explosive shipping container before contractor disposal. Ms. Pettyjohn was also copied on Plaintiff's November 1, 2021 email reporting EEO retaliation and safety concerns (Ex. 4). Colonel Felt, also named in Request No. 5, knew of Plaintiff's EEO activity by September 12, 2019, when Plaintiff told him by email that he had filed an EEO complaint against Tom Caudill, Tim Myers, and Barry Bun, and Colonel Felt replied the same day (Ex. 6, ROI p. 108).

The records are relevant for three reasons. First, they bear on which officials — including Mr. Ober, the official who proposed Plaintiff's removal, and Colonel Felt — had

responsibility for the area and knew of Plaintiff's safety concerns. Plaintiff believes Mr. Ober had a role connected to the storage of the bottle and seeks records to confirm or refute that. Second, Plaintiff was removed in part on specifications involving workplace rules, including an open beverage in the machine shop. How management handled a serious hazardous-material incident within its own responsibility is relevant to whether workplace rules were applied evenhandedly to Plaintiff or used as a pretext. Third, discovery is not limited to what was in the EEOC record; it extends to any nonprivileged matter relevant to a claim or defense in this action.

**Plaintiff's proposed narrowing:**

> Limit Request No. 5 to: (i) documents showing the bottle's origin, its transfer from Hanscom Air Force Base or any other location, and its storage history, whenever created; and (ii) for July 1, 2021 through December 31, 2021, the mishap or incident report; the Fire Department and RV Safety assessment records; hazardous-waste, shipping, and disposal records for the bottle; documents showing where the bottle was stored and which organization or official was responsible for that storage area; and emails about the bottle sent or received by Colonel Felt, Dan Ober, Erin Pettyjohn, Mike Martin, or Erik Kappe. If the bottle was disposed of after December 31, 2021, Plaintiff also requests the disposal records. Plaintiff will replace "sufficient to identify" with "documents showing."

## III. DEFENDANTS' RESPONSES DO NOT STATE WHETHER DOCUMENTS ARE BEING WITHHELD

Fed. R. Civ. P. 34(b)(2)(B) requires a responding party to "state with specificity the grounds for objecting to the request, including the reasons," and Rule 34(b)(2)(C) provides: "An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." Defendants' responses to Requests Nos. 1, 2, 3, and 5 do not state whether any responsive materials are being withheld, and Defendants have not produced any part of those

requests that they do not object to. Plaintiff respectfully asks that Defendants be directed to make that statement for each request.

## IV. WHAT PLAINTIFF RESPECTFULLY ASKS AT THE STATUS CONFERENCE

If the Court permits, Plaintiff respectfully asks the Court to:

1. Note that a discovery dispute exists regarding Requests for Production Nos. 1–5, and that Plaintiff has offered the narrowed versions described above;
2. Direct the parties to confer about the narrowed requests, and direct Defendants to state, for each request, whether responsive materials are being withheld on the basis of any objection, as Rule 34(b)(2)(C) requires;
3. For good cause, extend the 21-day period under D.N.M.LR-Civ. 26.6 for Plaintiff to file a motion to compel to a date the Court finds appropriate (Plaintiff suggests November 16, 2026), so that Plaintiff and defense counsel, Peter Haynes, can confer without Plaintiff being deemed to have accepted Defendants' objections. Good cause exists because Plaintiff is pro se and files and receives papers by mail; because Defendants' responses, which Defendants certify were mailed on October 1, 2026 (Doc. 55), did not reach Plaintiff's mailbox until late on October 8, 2026, and Plaintiff received them on October 9, 2026, leaving him about 13 of the 21 days; because on October 8, 2026, the day the package arrived, Plaintiff emailed defense counsel with his mailbox service's arrival notice and received an automatic reply stating that counsel is out of the office until October 25, 2026, after the 21-day period would end (Ex. 7); and because Plaintiff would like to confer with the counsel assigned to this case, Mr. Haynes, which would also not require the United States Attorney's Office to assign another attorney to fill in during Mr. Haynes's absence. Plaintiff believes an extension is in the interest of all parties; and
4. Provide any other guidance the Court considers appropriate for resolving this dispute, including an informal discovery conference if the Court prefers that procedure.

A copy of this Statement is being served on defense counsel. Plaintiff invites counsel to confer about the narrowed requests before or after the status conference.

## V. INDEX OF EXHIBITS

| Exhibit | Document | Relates to / Purpose |
|---|---|---|
| 1 | Plaintiff's First Request for Discovery (Requests for Production Nos. 1–5), served September 1, 2026 | The requests in dispute (D.N.M.LR-Civ. 37.1(a)) |
| 2 | Defendants' Responses to Plaintiff's First Request for Discovery, served October 1, 2026 (5 pages) | Defendants' objections (D.N.M.LR-Civ. 37.1(b)) |
| 3 | (a) Email from Arthur F. Murfin to Rick Buhl, "Safety Concern," July 17, 2013; (b) its attachment, printed July 15, 2013 (Rocky Mountain News article "A Cold Warrior's Plague" and National Jewish Health pages on chronic beryllium disease, its Beryllium Program, and Industrial Hygiene Program); and (c) Mr. Buhl's reply, "RE: Safety Concern," July 18, 2013 (as forwarded to Plaintiff's personal email on December 13, 2013) | Requests Nos. 1, 2, and 3 — the 2013 safety disclosure |
| 4 | Email from Arthur F. Murfin to Dan Ober and Dennis Lange, copied to Richard Parris and Erin Pettyjohn, "RE: Friday 29 Oct 2021," November 1, 2021 (with Mr. Ober's October 29, 2021 email below it) | Requests Nos. 4 and 5 — prior EEO activity, management knowledge, and safety concerns |
| 5 | Email from Erin N. Pettyjohn to AFRL/RVB All Distribution List, "Safety Mishap – Pressurized Bottle," July 20, 2021 (as forwarded by Plaintiff from his work account to his personal account on February 24, 2023) | Request No. 5 — the July 2021 pressurized-bottle incident |

Arthur F. Murfin
300 Nickel Street, Suite 11, PMB 1031
Broomfield, Colorado 80020
303-217-0266
amcoalcreek@yahoo.com
Plaintiff Pro Se

October 12, 2026

Clerk of the Court
United States District Court for the District of New Mexico
Pete V. Domenici United States Courthouse
333 Lomas Blvd. NW, Suite 270
Albuquerque, New Mexico 87102

**Re: *Murfin v. United States of America, et al.*, No. 1:25-cv-00664-JFR-JMR**
**Telephonic Status Conference set for Thursday, October 15, 2026, at 10:30 a.m. (Doc. 53)**

Dear Clerk of the Court:

I am the Plaintiff, proceeding pro se, and I do not have electronic filing access. Enclosed for filing in the above case is **Plaintiff's Statement of Reasons for Requested Discovery and Notice of Discovery Dispute, Submitted for the October 15, 2026 Status Conference**, with Exhibits 1 through 7 and a Certificate of Service.

Because the status conference is set for Thursday, October 15, 2026, I respectfully ask that the enclosed document be docketed upon receipt and, if possible, brought to the attention of the presiding judge's chambers before the conference.

The enclosed Statement also asks the Court, for good cause, to extend Plaintiff's 21-day period under D.N.M.LR-Civ. 26.6 to file a motion to compel to November 16, 2026 (Statement, Section IV, item 3), so that I can confer with defense counsel, Mr. Haynes, after he returns to the office on October 25, 2026. Because that period would otherwise end on or about October 22, 2026, I would be grateful if the Statement could reach chambers before the conference.

A copy has been served on counsel for Defendants, Assistant United States Attorney Peter Haynes, by U.S. Mail. Thank you for your assistance.

Respectfully,
/s/ Arthur F. Murfin
Plaintiff Pro Se

Enclosures: Statement (with Exhibit Index); Exhibits 1–7; Certificate of Service

| Exhibit | Document | Relates to / Purpose |
|---|---|---|
| 6 | Excerpts from the Report of Investigation, EEO matter 8Y1M1901620 (ROI pp. 1–5, 62, 70, 101–108, and 124): cover and index; Plaintiff's sworn answers; July–August 2017 job-offer emails and August 24, 2017 email to Lt Col Reed; September 2019 emails with Col. Felt; question to Dr. Caudill | Requests Nos. 1, 2, 4, and 5 — reprisal before Plaintiff's start at Kirtland; Col. Felt's knowledge of EEO activity |
| 7 | Plaintiff's October 8, 2026 email to defense counsel (11:40 p.m.); Colorado Mail Services/iPostal1 arrival notice for Plaintiff's mailbox, October 8, 2026 (4:28 p.m.); and counsel's automatic reply, October 8, 2026 (11:43 p.m.), stating he will return October 25, 2026 | Good cause to extend the D.N.M.LR-Civ. 26.6 period; Plaintiff's attempt to confer |

Dated: October 12, 2026

Respectfully submitted,

/s/ Arthur F. Murfin

Arthur F. Murfin
300 Nickel Street, Suite 11, PMB 1031
Broomfield, Colorado 80020
303-217-0266
amcoalcreek@yahoo.com
Plaintiff Pro Se

**CERTIFICATE OF SERVICE**

I certify that on October 12, 2026, I sent by FedEx the foregoing Plaintiff's Statement of Reasons for Requested Discovery and Notice of Discovery Dispute, with Exhibits 1 through 7, to the Clerk of the Court for filing, and that on the same date I served a true and correct copy by first-class United States Mail, postage prepaid, on counsel for Defendants at the following address:

Peter Haynes
Assistant United States Attorney
201 Third Street NW, Suite 900
Albuquerque, New Mexico 87102
Peter.Haynes@usdoj.gov

/s/ Arthur F. Murfin
Plaintiff Pro Se

# EXHIBIT 1

Plaintiff's First Request for Discovery
(Requests for Production Nos. 1–5), served September 1, 2026

Murfin v. United States of America, et al., No. 1:25-cv-00664-JFR-JMR

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ARTHUR F. MURFIN, Plaintiff,

v.

UNITED STATES OF AMERICA, et al., Defendants. Case No. 1:25-cv-00664-JFR-JMR

## PLAINTIFF'S FIRST REQUEST FOR DISCOVERY

Plaintiff Arthur F. Murfin, appearing pro se, requests that Defendants produce the documents and electronically stored information described below. These requests concern workplace safety disclosures, agency response, related investigations, and information potentially relevant to Plaintiff's claims and defenses.

**Definitions and Instructions**

"Documents" includes all writings, emails, attachments, memoranda, reports, notes, electronic records, photographs, spreadsheets, databases, and electronically stored information.

"Produce" means produce reasonably available responsive materials in their original or native electronic format when practicable, including accompanying metadata for emails and electronic communications. If any responsive material is withheld on a claim of privilege, identify the material and the basis for withholding sufficiently to permit assessment of that claim.

**Request No. 1**

Produce all emails, attachments, forwards, replies, routing slips, notes, memoranda, reports, logs, intake records, referrals, action items, and closure records relating to Plaintiff's July 17, 2013 safety disclosure to Rick Buhl concerning beryllium-copper machining at Hill Air Force Base. This includes materials held in sent-mail, inboxes, archived systems, supervisory files, safety-office files, industrial-hygiene files, and other agency repositories.

**Request No. 2**

Produce documents sufficient to identify Rick Buhl's position, duties, chain of command, receipt of Plaintiff's July 2013 disclosure, any forwarding or referral of that disclosure, any determination concerning whether it involved occupational safety or whistleblower activity, and any action taken, recommended, or declined in response. This includes communications with safety, industrial hygiene, legal, labor, management, EEO, IG, or medical personnel about that disclosure.

**Request No. 3**

Produce all documents concerning beryllium-copper machining at Hill Air Force Base during the relevant period, including exposure assessments, air-sampling data, industrial-hygiene surveys, medical-surveillance policies, hazard analyses, operating instructions, PPE requirements, engineering controls, administrative controls, safety-committee materials, training records, corrective-action records, and outside consultations or recommendations, including any contact with or reference to National Jewish Medical and Research Center.

**Request No. 4**

Produce the complete report of investigation for matter 8Y1M1901620, including all exhibits, witness statements, interview notes, investigator correspondence, transmittal records, index, attachments, agency submissions, final-agency-decision materials, and records showing requests for those materials and agency responses or non-responses. This request also includes documents reflecting whether the matter contained allegations or evidence of reprisal before Plaintiff's physical start at AFRL/Kirtland.

**Request No. 5**

Produce all emails, reports, incident records, safety assessments, emergency-response records, photographs, chain-of-custody records, hazardous-waste determinations, shipping records, disposal records, building-access or evacuation/telework records, and communications concerning the pressurized bottle described in Erin Pettyjohn's July 20, 2021 email, "Safety Mishap – Pressurized Bottle." This includes documents sufficient to identify the bottle's origin, transfer history, storage location, responsible lab or program, and the involvement of Colonel Felt, RV Safety, Kirtland AFB Fire Department, Mike Martin, Erik Kappe, Erin Pettyjohn, Dan Ober, and other officials with supervisory, safety, or custodial responsibility for the area where it was stored or discovered.

Plaintiff requests that Defendants preserve all potentially responsive materials pending production.

Respectfully submitted this 9/1/2026.

Arthur F. Murfin

Arthur F. Murfin
Plaintiff Pro Se
300 Nickel Street, Suite 11, PMB 1031
Broomfield, Colorado 80020
303-217-0266
amcoalcreek@yahoo.com

# EXHIBIT 2

Defendants' Responses to Plaintiff's First Request for Discovery,
served October 1, 2026

Murfin v. United States of America, et al., No. 1:25-cv-00664-JFR-JMR

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ARTHUR F. MURFIN,

Plaintiff,

v. 25cv664 JFR/JMR

UNITED STATES OF AMERICA, et al.,

Defendants.

**DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR DISCOVERY**

Defendants United States of America, the Department of Defense, Peter B. Hegseth, the United States Department of the Air Force, and Dr. Troy Meink, by and through their undersigned counsel, hereby respond to Plaintiff's First Request for Discovery, i.e., Plaintiff's Request for Production Nos. 1-5.

At the threshold, Defendants object to Plaintiff's "[d]efinitions and [i]nstructions" to the extent they conflict with the Federal Rules of Civil Procedure. Further, Plaintiff's request for "metadata for emails and electronic communications" is unduly burdensome and not proportional to the needs of the case given the age of the items sought in the requests (e.g., Request No. 1 seeks information from 2013), the breadth of the requests (e.g., Request No. 2 seeks nearly every type of document imaginable, including "archived systems"), and the low to nonexistent importance and evidentiary value that metadata has in this case. *See U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 246 (S.D. Cal. 2015) ("[C]ourts have required the requesting party to show a particularized need for the metadata, not simply a generalized view as to its importance") (internal quotation and citation omitted). Further, prior to this lawsuit, Plaintiff went through the EEOC process, and the veracity of the email communications and electronic data did not appear

to be at issue, nor were veracity issues alleged in the Complaint, so metadata is irrelevant because it will not lead to the discovery of relevant evidence.

**Request No. 1**

Produce all emails, attachments, forwards, replies, routing slips, notes, memoranda, reports, logs, intake records, referrals, action items, and closure records relating to Plaintiff's July 17, 2013 safety disclosure to Rick Buhl concerning beryllium-copper machining at Hill Air Force Base. This includes materials held in sent-mail, inboxes, archived systems, supervisory files, safety-office files, industrial-hygiene files, and other agency repositories.

**RESPONSE**: Defendants object to this request. First, it is overly broad, unduly burdensome, and disproportionate to the needs of the case because it seeks nearly every type of document and file, including "industrial-hygiene files," whatever those are, all of which predate Defendant's employment giving rise to the allegations in the Complaint; the requested information is from a U.S. Air Force base in another state that is unrelated to this lawsuit; and the named individual is not related to this case. The burden of searching for and gathering these documents is not proportional to its importance to this case. Second, it seeks irrelevant information because the date of the alleged safety disclosure predates this lawsuit; occurred at a different U.S. Air Force base in another state; and involves an individual that is not related to this case.

**Request No. 2**

Produce documents sufficient to identify Rick Buhl's position, duties, chain of command, receipt of Plaintiff's July 2013 disclosure, any forwarding or referral of that disclosure, any determination concerning whether it involved occupational safety or whistleblower activity, and any action taken, recommended, or declined in response. This includes communications with safety, industrial hygiene, legal, labor, management, EEO, IG, or medical personnel about that disclosure.

**RESPONSE**: Defendants object to this request. First, the phrase "sufficient to identify" is vague and improper because it requires Defendants to make a judgment about the sufficiency of certain documents. Second, it is overly broad, unduly burdensome, and disproportionate to the needs of the case because it seeks documents that predate Plaintiff's employment giving rise to

this lawsuit, are from a U.S. Air Force base in another state, and involve an individual that is not related to this case. Third, it seeks irrelevant information because documents related to this individual's actions and his communications with coworkers predate this lawsuit, occurred at a different U.S. Air Force base in another state, and the individual is not related to this case.

**Request No. 3**

Produce all documents concerning beryllium-copper machining at Hill Air Force Base during the relevant period, including exposure assessments, air-sampling data, industrial-hygiene surveys, medical-surveillance policies, hazard analyses, operating instructions, PPE requirements, engineering controls, administrative controls, safety-committee materials, training records, corrective-action records, and outside consultations or recommendations, including any contact with or reference to National Jewish Medical and Research Center.

**RESPONSE**: Defendants object to this request. First, the phrase "the relevant period" is undefined, so this request is overly broad, unduly burdensome, and disproportionate to the needs of the case because it appears to contemplate documents spanning from the creation of the U.S. Air Force during the World War II era to the present. Second, it is overly broad, unduly burdensome, and disproportionate to the needs of the case because it seeks nearly every type of record, including sampling records, for topics that are unrelated to the allegations in the Complaint. Third, it seeks irrelevant information because documents related to "beryllium-copper machining at Hill Air Force Base" predate Plaintiff's employment giving rise to this lawsuit, are from a U.S. Air Force base in another state, and involve a named entity (the "National Jewish Medical and Research Center") that is not related to this case.

**Request No. 4**

Produce the complete report of investigation for matter 8Y1M1901620, including all exhibits, witness statements, interview notes, investigator correspondence, transmittal records, index, attachments, agency submissions, final-agency-decision materials, and records showing requests for those materials and agency responses or non-responses. This request also includes documents reflecting whether the matter contained allegations or evidence of reprisal before Plaintiff's physical start at AFRL/Kirtland.

**RESPONSE**: Defendants object to this request to the extent the phrase "records showing requests for those material and agency responses or non-responses" is vague. Defendants are not sure what that clause seeks. Defendants also object to the last sentence requesting documents from 8Y1M1901620 that predate Plaintiff's employment at "AFRL/Kirtland" as vague and irrelevant because 8Y1M1901620 concerns allegations of age and disability discriminatory beginning July 29, 2019, and that case contains no allegations of prior discrimination.

Please see the investigative file for 8Y1M1901620, which is bates stamped Murfin 25-664 (USA) 001217-001746.

**Request No. 5**

Produce all emails, reports, incident records, safety assessments, emergency-response records, photographs, chain-of-custody records, hazardous-waste determinations, shipping records, disposal records, building-access or evacuation/telework records, and communications concerning the pressurized bottle described in Erin Pettyjohn's July 20, 2021 email, "Safety Mishap – Pressurized Bottle." This includes documents sufficient to identify the bottle's origin, transfer history, storage location, responsible lab or program, and the involvement of Colonel Felt, RV Safety, Kirtland AFB Fire Department, Mike Martin, Erik Kappe, Erin Pettyjohn, Dan Ober, and other officials with supervisory, safety, or custodial responsibility for the area where it was stored or discovered.

**RESPONSE**: Defendants object to this request. First, the last sentence is vague because it requires Defendants to review documents "sufficient to identify" various aspects of the bottle and to ascertain "the involvement" of various people, which improperly requires Defendants to make a judgment about the sufficiency of the documents. Second, it is overly broad, unduly burdensome, and not proportional to the case because it seeks nearly every type of record related to the creation,

handling, and storage of an item ("Pressurized Bottle"), but this item does not appear to be related to this case, so the burden of searching for, gathering, and producing this documentation is out of proportion to its importance. Third, this request seeks irrelevant information because the "Pressurized Bottle" appears to be unrelated to this case, the Complaint, and the EEOC proceedings.

Respectfully submitted October 1, 2026,

TODD BLANCHE
Attorney General
RYAN ELLISON
First Assistant United States Attorney

*/s/ Peter Haynes*
PETER HAYNES
Assistant United States Attorney
201 Third Street NW, Suite 900
Albuquerque, New Mexico 87102
(505) 346-7274; Fax (505) 346-7205
Peter.Haynes@usdoj.gov

# EXHIBIT 3

Email from Arthur F. Murfin to Rick Buhl, "Safety Concern," July 17, 2013,
with attachment printed July 15, 2013, and
Mr. Buhl's reply, "RE: Safety Concern," July 18, 2013

Murfin v. United States of America, et al., No. 1:25-cv-00664-JFR-JMR

## Safety Concern

From: Murfin, Arthur F Civ USAF AFMC 533 CMMXS/MXDPBCG (arthur.murfin@hill.af.mil)

To: Richard.Buhl@hill.af.mil

Date: Wednesday, July 17, 2013 at 08:29 PM MDT

Mr. Buhl,

A few weeks ago you came to building 510 to express your concern for the safety of workers , the need for a change in attitude towards safety in the work place and people who bring concerns to management's attention. Your situation is similar to the situation EG&G was in when they took over managing the DOE nuclear weapons plant I used to work at. They needed to change the work environment.
When EG&G took over there already was a Joint Company Union Safety Committee. However many of the concerns seemed to just stay open with no resolution in site. The change they made might help you change attitudes and make workers more willing to speak up and voice concerns. They beefed up the Joint Company Union safety Committee and added a commitment tracking system. If it was a commitment it was tracked and reported to senior management. It didn't matter whether the commitment was made to the EPA or the Union it was tracked.
A worker at the nuclear weapons plant could file a safety concern through the union safety committee and have union protection. I was the Safety Committee rep for Bldg. 460. The addition of the commitment tracking system worked quite well . Safety issues did not get side tracked. In my onion allowing workers to file a safety concern through the union did make them more likely to file a concern. In many cases the person would go to a union steward and the steward would file the concern which allowed the worker to remain unknown.

I have my own safety concern which I would like to bring to your attention. I am concerned about the BE copper machined at hill. The nuclear weapons plant I worked at in Colorado had many engineering and administrative controls to keep BE machinists from breathing be dust or vapors. We still had a very bad problem. The first 8 pages of the attachment to this email are an old newspaper article that tells that sad story as well as some other places that had a problem.
The last 8 pages are about National Jewish Medical and Research Center. National Jewish has more experience with the diagnosis and treatment of beryllium disease than any other group in the world. They also have an Industrial Hygiene program that will assess a company's exposure and related health risks. I think you should contact them and see what they think about what we do here at Hill. National Jewish did some studies which indicate the OSHA PEL is incorrect. The Air Force PEL most likely comes from the OSHA PEL not the National Jewish study.
Because of what I saw happen at Rocky Flats I urge you to contact national Jewish medical and Research Center and follow their recommendation Even if it is more strict than the air Force Standard.

Respectfully,

Art Murfin

-------------------------------------------------------------------

Please open the attached document. This document was digitally sent to you using an HP Digital Sending device.

smime.p7s
5.5 kB

[Untitled].pdf
3.9 MB

×

Keyword Navigation:
Go!
Click for a list of keywords

× News
Columbine
JonBenet
Election 2000
Homeless murders
Legislature
Nation
World
Sci/Tech
Religion
Columnists
Opinion
Denver Square
Births
Weddings
Obituaries
Weather
Lottery
× Business
× Sports
× Recreation
× Going Out
× Staying In
× Autos
× Careers
× Homes
× Classified

Not Found

Not Found

Not Found

E-Mail This | Print This

# Dust a Cold Warrior's plague

National Jewish sleuth tracks beryllium illness catching metal workers, others unaware of risks

By Lisa Ryckman
*Denver Rocky Mountain News Staff Writer*

For 14 years, Beverly Lutz worked in Building 444 at Rocky Flats, confident she was safe.

Behind the door of 444, foot soldiers of the Cold War made nuclear weapon parts out of the non-radioactive metal beryllium: lighter than aluminum, stronger than steel and safer than plutonium — or so they thought.

Decades before, people had gotten lung disease from inhaling huge amounts of beryllium dust. But after the government put strict limits on exposure, the illness seemed to disappear.

The people who worked with the metal every day at Rocky Flats thought they were safe.

So did Beverly Lutz, who spent 32 years at the nuclear weapons plant as a secretary.

She'd never touched beryllium in her life.

-

Lee Newman came to Denver because he considered it the best place in the world to learn to be a lung doctor.

At the turn of the 20th Century, National Jewish Hospital and the Denver Sheltering Home cared

Tapes show Columbine confusion

Gunmen's fathers phoned sheriff

United reduces flight delays, but pilot shortage persists

Jeep, pickup truck pulled from steep slope in San Juans

Good boots keep firefighter a foot ahead of trouble

Wildfire sweeps Mesa Verde

Fire evacuees in Montana return home for brief visit

Historic Overland Trail protected for future

Tips sought in paint, oil dumpings

Dog walk raises funds for bloodhounds

Tape excerpts

Church honors bikers' free spirits

for victims of tuberculosis, a chronic lung disease that thrived on poverty and spread with a cough.

In 1978, five years before Newman arrived, the two institutions merged to become what is now National Jewish Medical and Research Center, the largest U.S. medical center devoted to the study and treatment of chronic respiratory diseases and immune system disorders.

As a medical student, Newman had been drawn to pulmonology — the study of the lungs — by emotion. "I felt really sorry for people who couldn't breathe," he says. "I wanted to help them."

**Lland rovers**

**Vehicle fires deserve to be taken seriously**

**Actor Guinness dies**

**911 tapes capture shock, fear**

**Suburban briefs**

He took a roundabout route into medicine. The New Jersey-born son of a art teacher and a retailer, Newman was still a teen-ager when he started a successful business with his brother making and marketing translucent plastic jewelry.

Eventually, Newman, along with his brother and mother, wrote a series of crafts books, how-tos on everything from lamps to frames to kites — his personal passion. He worked as a reporter in college, then earned a master's degree in social psychology before heading to medical school.

Workplace disease attracted him because of his desire to prevent illness, not just treat it.

In the library at National Jewish, Newman decided on a research topic: he would expose mice to beryllium dust to try to better understand how the immune system reacts to metals that cause disease.

Beryllium, found in beryl and betrandite rock, is at once strong and lightweight, non-magnetic and a good conductor of heat and electricity: the perfect metal for making nuclear weapons.

Newman thought that decades-old government limits on beryllium exposure had virtually eliminated chronic beryllium disease, also known as CBD or berylliosis. But the research would help him understand the immune mechanism behind a fairly common lung disease, sarcoidosis.

Not long after Newman began his work, the medical director at Rocky Flats called with a question: he needed to move a pregnant woman out of the plutonium area because of the radiation danger. Would it be safe to expose her to beryllium?

"And we said, 'Beryllium? You have beryllium at Rocky Flats?' That's how little we knew at the time," Newman says. "Here I am, working at a research lab studying beryllium, 17 miles from the place where 60 percent of the beryllium in the Western world is being used, and I don't even know it."

-

Think of a war between the body's immune system and invading particles of beryllium, and the nature of CBD becomes clear.

"The lungs happen to be the battlefield," Newman says. "And by the end of

the battle, the battlefield is trashed."

Most people can inhale beryllium dust or fumes without becoming ill. But 2 to 6 percent of the population are allergic, triggering an immune response.

The body's efforts to surround and attack the beryllium particles causes scarring in the lungs that makes breathing difficult. The disease can take years to appear, and then it can be slow-moving but progressive: at first, the person might have trouble breathing during exercise. Eventually, they can't get enough oxygen when they're sitting still.

Debilitating as it is, CBD alone rarely kills, Newman says. But there is no cure. The treatment is the steroid prednisone in the early stages, with oxygen later.

Newman estimates that about 45 percent of the general population have a gene that puts them at higher risk, but people without that gene can still get the disease.

The key is exposure: without it, there is no berylliosis.

By the time Rocky Flats is closed, Newman believes there will be more than 300 people with CBD or sensitization, which often leads to the illness.

"The single most well-recognized and common work-related disease of Cold War veterans is beryllium disease," Newman says.

For these workers, it was the unexpected price of patriotism.

Now people with beryllium disease are cropping up at all of the nation's weapons complexes: Hanford, Wash.; Oak Ridge, Tenn.; Savannah River, S.C.; Los Alamos, New Mexico.

They are being screened with the test that Newman refined, one that he and his colleague Kathleen Kreiss took to Rocky Flats in 1985. They wanted to do a pilot study to determine the effect of beryllium exposure.

Their proposal brought together 80 people from companies and agencies with a stake in the outcome: Rocky Flats; its then-parent Rockwell International; Brush Wellman Inc., the main manufacturer of beryllium; and the U.S. Department of Energy.

"We were presenting this proposal looking for some funding from the DOE," Newman says. "In point of fact, we were rebuffed by them."

But the head of health and safety at Rocky Flats came down on Newman's side.

"It was his responsibility, it was on his watch," Newman recalls. "He basically ignored the advice he was getting from others and said, 'I'm going with you guys.'"

In the end, Rockwell International funded the first study, which screened 50 beryllium machinists. Ten percent of that group were sensitized. The next question: was it possible they already had the disease and didn't know it?

Workers volunteered or a bronchoscopy, a procedure that involved taking

small samples of their lung tissue.

"And lo and behold, what we found was, not only was that 10 percent sensitized, but most of them already had beryllium disease," Newman says. "That was an eye-opener. That was the watershed."

On the strength of that small study, Newman obtained $2 million from the National Institutes of Health to screen 900 Rocky Flats workers and begin looking at other companies around the nation.

The kind of job the worker did made a difference, the doctors discovered. Their level of beryllium exposure in that job made a difference. Many of the people who had disease had no symptoms at all. Others had symptoms that had been blamed on other ailments: the unexplained cough, shortness of breath, fatigue, weight loss, fevers and rash was emphysema if the patient smoked; if they didn't, it was asthma.

"Most doctors in this country have never seen a case of beryllium disease," Newman says. "So it's not even on their radar."

-

Margaret Simon was told she had a sinus problem. But treatment didn't help the coughing and the constant feeling that she couldn't catch her breath.

Another doctor said it was allergies, but the allergy shots didn't work. They thought it might be cancer, but it wasn't. Then she was diagnosed with sarcoidosis, a common lung disease caused by scarring of the lung tissue.

Simon took prednisone, which seemed to help. But within a month of going off the drug, the cough was back.

"Then the doctor found out I had worked with beryllium," Simon said.

He sent her to National Jewish to see the head of the Division of Environmental and Occupational Health Sciences — Lee Newman. He diagnosed her illness.

Newman has had to tell many people that they have CBD; delivering bad news is part of the job. He has done it hundreds of times, and it's only getting harder.

"I admit to getting angry, and I get particularly angry when I see patients getting disease from exposures occurring today, which in my mind is inexcusable," Newman says. "Beryllium disease in this day and age should be preventable in the workplace, and yet we're not preventing it."

Simon, 54, never worked in a weapons complex. She is a dental technician — a member of what Newman refers to as a new epidemic wave of CBD sufferers who only now are realizing the danger of working with alloys, mixtures of metals such as copper, magnesium or aluminum that contain as little as 2 percent beryllium.

"They have been told and they believe that a little bit of beryllium is safe, that if you work with alloys, it's safe," Newman says. "And in fact, that's not true."

Bridges and crowns made of beryllium alloys don't cause disease in dental patients; Simon became ill by inhaling the dust created by grindinging and polishing them.

The lab was typical: two rooms in a small house, 10 technicians, minimal protection. Most of the nation's estimated 47,000 dental techs work in small mom-and-pop shops, ones that never get visits from the federal Occupational Safety and Health Administration to ensure compliance with limits on beryllium exposure.

In Simon's former lab, they worked in a cloud of dust and fumes so heavy that the owner was able to extract $7,000 in metal from the carpeting when he replaced it.

"She got into this job because we thought it was clean and safe," said her husband, Vaughn. "It turned out it was neither of those things."

-

Crush a piece of beryllium the size of a pea, then sprinkle the dust in a room one mile square and six feet deep. That is the amount of beryllium exposure the federal government considers acceptable during a work day.

It is an amount that can still cause disease.

The standards were set 50 years ago in response to cases of acute beryllium poisoning caused by exposure to large amounts of the metal's dust and fumes. With the limits in place, beryllium disease seemed to disappear.

An illusion — one Newman has shattered with his research.

"We're seeing disease occurring at levels one-tenth of the current government standards," he says.

Newman fiddles with a keychain made by Brush Wellman, the Cleveland, Ohio-based company that produces much of the beryllium used in the United States.

"What metal would you say this is?" he asks. The medallion dangling from the chain looks like copper, but it also contains 2 to 5 percent beryllium.

"If you were to take some Scotchbrite from your kitchen sink and start shining it up, you would be creating a plume of particles that are going into your lungs, that are just the right size to get into your deep lung, where your immune system could potentially react," Newman says.

Many of the people Newman screens have no symptoms: that's the point of medical screening programs like his.

"There are treatments, and early detection allows you to treat at an earlier stage, before they have to go on a bottle of oxygen," Newman says.

The doctor is in the fifth year of a study of 70 people who were beryllium sensitized but had no signs of the disease. The work has uncovered another piece of the beryllium disease puzzle.

"What we have found is, sensitivation converts to disease at a rate of approximately 10 percent per year," Newman says.

That means that after five years, half of those sensitized have gone on to develop the lung scars that characterize CBD.

In some plants, everyone Newman screens not only tests positive for beryllium sensitization but already has the disease.

Some of those people have mild cases that don't require steroids or oxygen; after five years, 25 percent of those people will need treatment.

The incredible toxicity of beryllium means that the best way to prevent all disease is to stop using it, Newman says. Substitute some other metal to make golf clubs and bicycles and toasters and dental bridges.

There is only one industry that must use beryllium.

"If you felt like you had to make a nuclear weapon," Newman says, "there is no substitute."

-

The e-mail landed in Newman's computer from exactly half a world away, a plea for help from an area near the Chinese border in northeast Kazakhstan.

It is the only place on earth where they see more people with beryllium disease than Lee Newman does at National Jewish.

The message came from a doctor who had heard of Newman's research and wondered if he could help them develop a blood-testing program for Ust-Kamenogorsk, an entire city contaminated with beryllium.

The Ulbinsky metallurgical plant there is the Soviet-era equivalent of Rocky Flats, and the workers have carried the toxic residue of those weapons to their homes. Samples of beryllium have been found on the paths leaving the plant, on the tram, on the steps of the apartment building, on the pillow in the bedroom.

"They've got close to 800 workers with this disease at that one plant, and they've carried it out to their community," Newman says.

Through the years, workers at the beryllium factory were exposed to levels 100 times the acceptable U.S. standard. The result was every known ailment associated with beryllium, including lung cancer.

A 1974 study showed that 4 percent of Ust-Kamenogorsk's general population had been sensitized to beryllium; it was measured in children's hair and mothers' milk. Airborne levels of beryllium were so high that people living 5 kilometers from the plant were being exposed to what the U.S. Environmental Protection Agency's highest acceptable level.

Then in 1990, an explosion and fire at the Ulbinsky factory sent a plume of beryllium dust wafting over the city and beyond. More than 120,000 were exposed to the metal's dust and fumes.

A year ago, Newman and an epidemiologist arrived to see if they could design a surveillance program. Clean-up is too expensive for this impoverished region; exposure is inevitable.

"So for them, probably the major remedies are being able to figure out who's got the disease, and get them treatment," says Newman, who is looking for funding to help the city.

Treatment is problematic. Availability of prednisone is very limited, and oxygen therapy is unheard of. But the need is urgent, because the younger the person with CBD, the more aggressive the treatment must be.

And in Ust-Kamenogorsk, there are children allergic to beryllium.

"That 5-year-old has another 80 years' opportunity to have very severe lung injury. I would consider them at high risk for losing their lungs," Newman says. "And you can't live without them."

-

Cases of beryllium disease arrive on Newman's doorstep every day, and more of them are coming from industries that have nothing to do with nuclear bombs.

"We're just seeing a kind of wake-up call today," the doctor says. "The aerospace industry is just barely waking up to the hazard. The metal machining industry is just barely waking up to the hazard. Metal reclamation plants are just barely waking up to the hazard. The dental technicians are just waking up to the hazard."

Margaret Simon still works as a dental tech; her current employer does not use beryllium. Her co-workers all know she suffers from CBD, but for Simon, berylliosis is a very lonely disease. She doesn't know anyone else who has it.

"Not a soul," she says.

But Newman predicts that will change, unless workers and their employers acknowledge and deal with the danger. A grass-roots movement to educate and protect workers has emerged among people with CBD, fueled by the relief of finally being properly diagnosed and the anger that often follows.

"They're angry because they got exposed to something at work that they didn't know was hazardous," Newman says. "As many of them have said to me, 'If I had known about beryllium, I would have worried more about beryllium than plutonium.' Beryllium was more insidious."

Behind the door of Building 444, Beverly Lutz worked in an office as the superintendent's secretary. When she had to walk through the beryllium shop, she would don a smock and booties — all the protection anyone thought she needed.

Sixteen years after Lutz left 444, she became one of Lee Newman's patients.

"I was never told there was any possibility of me contracting any type of illness from being in that building," she says. "Now that I look back, I had a

lot of health problems."

Like others with beryllium disease, Lutz found herself struggling with both an incurable illness and an intractable company.

"I just felt real disappointment that I had to resort to hiring an attorney to go through the worker's comp process because the company was not willing to admit liability," Lutz says. "They said I had to prove I contracted it there. Well, I worked there from the time I was 18 years old. I never worked anywhere else. Where else would I get it?"

Newman's revelations about the toxic nature of beryllium — and the minute amounts needed to cause disease — have been the catalyst for an effort to change government policy. The Energy Department recently decided to honor the health claims of Cold War weapons workers, a plan yet to be approved by Congress.

The concept began with compensation for victims of berylliosis; recently it was expanded to include everyone who became ill producing the nation's nuclear weapons, whether from beryllium or radiation exposure.

The DOE estimates there are 3,000 eligible cases nationwide, including 1,200 with cancer. It will cost $360 million for the first three years.

"We are moving fast forward to do the right thing for these workers," Energy Secretary Bill Richardson said.

While Congress debates, Lutz copes with the anxiety and depression that often accompany chronic illness. CBD sufferers in Colorado have formed a once-a-month support group at National Jewish, but Lutz sometimes hesitates to go.

It means seeing people tethered to oxygen tanks, people whose beryllium disease has advanced much further than hers.

"The people are good friends and you hate to see them suffer," Lutz says. "The main thing is, not knowing what could happen in the future. Eventually, I might end up in that situation."

*Contact Lisa Ryckman at (303) 892-2736 or ryckmanl@RockyMountainNews.com.*

***August 6, 2000***


| News | Business | Sports | Recreation | Going Out | Staying In | Classified |
|---|---|---|---|---|---|---|
| Weather | Stocks | Broncos | Snow Rept. | Movies | TV | Place an ad |
| Opinion | Bank Rates | Avalanche | Hiking | Dining | Health | Auto |
| Nation | | Nuggets | Biking | Music | Cookbook | Careers |
| World | | Rockies | Fishing | On Stage | Garden | Homes |
| Sci/Tech | | College | Golf | Books | Crossword | |
| Births | | RockyPreps | Calendar | Travel | | |
| Weddings | | | Dentry | | | |
| Deaths | | | | | | |


User Agreement / Privacy Statement

© Copyright, Denver Publishing Co.
Subscribe to the **News**
Questions? Comments? Talk to Us

**National Jewish Health**
Science Transforming Life

**njhealth.org Home**
**For Professionals**

Careers
| My National Jewish Health

# Chronic Beryllium Disease: About Beryllium

## What is beryllium?

**Reviewed on** 5/11
**By Dr. Maier** et al.

Beryllium is a naturally occurring element found in soil in the form of beryl and in rock in the form of bertrandite. Beryllium is lighter than aluminum yet stiffer than steel. It is useful in many industrial applications. While beryllium occurs naturally in soil and in coal, it is because this beryllium is often locked up in solid rock and soil composition that naturally occurring air concentrations are extremely low, even in major urban areas. This means you cannot develop beryllium sensitization from casual exposure to soil and rocks outdoors.

## Where is beryllium used?

Beryllium is extremely lightweight, hard, a good electrical and thermal conductor and nonmagnetic. It is used by many industries, including:

- ***Aeronautics and Aerospace*** - Components made from pure beryllium as well as copper-, aluminum-, nickel-, and magnesium-beryllium alloys
- ***Ceramic manufacturing*** - Semi-conductor chips, ignition modules, crucibles, jet engine blades and rocket covers
- ***Electronics*** - Transistors, heat sinks, x-ray windows, computer and telecommunication parts, and automotive parts
- ***Atomic energy and defense industries*** - Heat shields, nuclear reactors, components for nuclear weapons
- ***Laboratory work*** - Research and development, metallurgy, chemistry
- ***Mineral extraction*** - Ore
- ***Dental work*** - Alloys in crowns, bridges, and dental plates
- ***Metal recycling*** - Computers, electronics, copper-alloy tubing, rod and wire
- **Sporting goods** - Golf clubs
- Prior to 1951, beryllium was used in the manufacturing of ***fluorescent lamps***.

## Is beryllium hazardous?

Handling beryllium in its solid form, such as a finished computer part that contains beryllium, is not known to cause illness, unless the part still has dust on it from the production process. Exposure to beryllium salts can cause a rash and/or inflammation in the respiratory tract. Most workers today are exposed to the metal or oxide forms. If beryllium enters the body through an opening in the skin, such as through a sliver or cut, it can cause a rash, poor wound healing, or wart-like skin bumps.

Although low levels of beryllium are found naturally in soil and air, there is not enough beryllium in the air or soil to cause beryllium sensitization or CBD from these sources alone, nor in the form of beryllium-rock in the ground known to cause an inhalation or skin exposure hazard.

It is important to know that no one develops beryllium sensitization or chronic beryllium disease (CBD) unless they are exposed to beryllium and develop an immune response to it. Beryllium sensitization and CBD may develop after an individual breathes beryllium dust or fumes. Most people who are exposed to beryllium will not experience health effects.

## I've been exposed to dust or fumes from an alloy that contains only a small amount of beryllium. Is this hazardous?

Some commonly used alloys include beryllium copper (up to 4% beryllium), beryllium aluminum (20-60% beryllium), and beryllium nickel (0.275-7% beryllium)[1]. Studies have shown that dust or fumes from alloys that contain beryllium can be just as hazardous as pure beryllium metal. A 1999 report summarized two cases of CBD caused by copper alloy containing 2% beryllium[2]. Other studies have shown that breathing even seemingly trivial amounts of beryllium dust or fumes can cause beryllium sensitization and chronic beryllium disease[3,4].

## Does beryllium cause cancer?

Beryllium has been shown to cause cancer in humans and in many species of animals. Studies have confirmed the association between beryllium exposure and lung cancer in humans, especially in individuals with acute beryllium disease, caused by very high levels of beryllium exposure[5]. Beryllium has been classified as a human carcinogen by the International Agency for Research on Cancer (IARC).

Despite the possibility of leading to lung cancer, the more common health concerns for beryllium-exposed individuals are beryllium sensitization and chronic beryllium disease (CBD), as levels of exposure are generally lower now than they were many decades ago when most of the cancer studies were conducted.

For more information on beryllium, please contact National Jewish Health® at 1.800.222.5864.

***References***

1. *Mroz MM, Balkissoon R, Newman LS. Beryllium. In: Bingham E, Cohrssen B, Powell C (eds.) Patty's Toxicology, Fifth Edition. New York: John Wiley & Sons 2001, 177-220.*
2. *Balkissoon RC, Newman LS. Beryllium cooper alloy (2%) causes chronic beryllium disease. J Occup Environ Med 1999; 41: 304-308.*
3. *Kreiss K, Mroz MM, Ahen B, Martyny JW, Newman LS. Epidemiology of beryllium sensitizations and disease in nuclear workers. Am Rev Respir Dis 1993; 148:985-991.*
4. *Newman LS, Kreiss K. Non-occupational chronic beryllium disease masquerading as sarcoidosis: Identification by blood lymphocyte proliferative response to beryllium. Am Rev Respir Dis 1992; 145:1212-1214.*
5. *Steenland K, Ward E. Lung Cancer Incidence Among Patients with Beryllium Disease: a Cohort Mortality Study. J Natl Cancer Inst 1991; 83:1380-1385.*
6. *Kriebel D, et al. The pulmonary toxicity of beryllium. Am Rev Respir Dis 1988; 137: 464-473.*
7. *Kreiss K, Newman LA, Mroz M, Campbell PA. Screening blood test identifies subclinical beryllium disease. J Occ Med 1989; 31:603-608.*
8. *Kreiss K, Wasserman S, Mroz MM, Newman LS. Beryllium disease screening in ceramics industry: Blood test performance and exposure-disease relations. J Occup Med 1993; 35: 267-274.*
9. *Kreiss K, Mroz MM, Newman LS, Martyny J, Zhen B. Machining risk of beryllium disease and sensitization with median exposures below 2 μg/m3. Am J Indust Med 1996; 30:16-25.*
10. *Kreiss K, et al. Risks of beryllium disease related to work processes at a metal, alloy and oxide production plant. Occup Environ Med 1997; 54:605-612.*

11. *Mroz MM, Kreiss K, Lezotte DC, Campbell PA, Newman LS. Re-examination of the blood lymphocyte transformation test in the diagnosis of chronic beryllium disease. J Allergy Clin Immunol 1991; 88:54-60.*
12. *Kreiss K, Miller F, Newman LS, Ojo-Amaize EA, Rossman MD, Saltini C. Chronic beryllium disease: From the work place to cellular immunology, molecular immunogenetics, and back. Cl Immunol Immunopath 1994; 71:123-129.*
13. *Rossman MD. Differential diagnosis of chronic beryllium disease. In: Rossman MD, Preuss OP, Powers MB, eds. Beryllium: Biomedical and Environmental Aspects. Baltimore: Williams & Wilkins, 1991; 167-175.*
14. *Newman LS, Mroz MM, Maier LA, Danilof EM, Balkissoon R. Efficacy of serial medical surveillance for chronic beryllium disease in a beryllium machining plant. J Occup Environ Med 2001; 43:231-237.*
15. *Yoshida T, Shima S, Nagoka K et al. A study on the beryllium Lymphocyte Transformation Test and the beryllium levels in working environment. Ind Health 1997; 35:374-379.*
16. *Cullen M, et al. Chronic beryllium disease in a precious metal refinery: clinical, epidemiologic, and immunologic evidence for continuing risk from exposure to low-level beryllium fume. Am Rev Respir Dis 1987; 135:201-208.*

**More Beryllium Disease Information**

- Overview of Beryllium Disease
- About Beryllium Disease
- Causes of Beryllium Disease
- Symptoms of Beryllium Disease
- Diagnosis of Beryllium Disease
- Treatment of Beryllium Disease
- Work Environment Management of Beryllium Disease
- Beryllium Disease FAQ

© 2013 National Jewish Health

National Jewish Health
Science Transforming Life

**njhealth.org Home**

**For Professionals**

**Careers**

| **My National Jewish Health**

## Beryllium Program

**1.800.423.8891 x1722**

The National Jewish Health team has more experience with the diagnosis and treatment of beryllium disease than any other group in the world. We emphasize early disease detection and intervention to halt or slow disease progression. Effective treatment for symptomatic beryllium disease is steroid therapy that stabilizes the disease and often improves symptoms, keeping people active and in the workforce. The later the disease is detected, the greater the health consequences.

Our comprehensive diagnostic capabilities include:

- Clinical laboratory testing including the beryllium lymphocyte proliferation test (BeLPT) for beryllium sensitization
- Complete medical evaluations by board-certified specialists
- Impairment evaluations (Department of Labor EEOICP) by certified, experienced examiners can be performed upon request.
- Pulmonary function testing
- Exercise tolerance testing and assessment of gas exchange
- Diagnostic chest imaging, including in-house B-readers for chest x-rays
- Facilities for performing bronchoscopy, lavage, and lung biopsy
- Medical record review
- Review of exposure sampling data

We also coordinate with local healthcare providers as appropriate to ensure effective diagnosis and case management.

For more information on any of our clinical beryllium-related services, including BeLPTs and clinical evaluation services, please contact us at BerylliumGroup@njhealth.org (mailto:BerylliumGroup@njhealth.org) (mailto:Beryllium@njhealth.org) or 1.800.423.8891, x1722.

### Assessing a Company's Beryllium Exposure and Related Health Risks

The Industrial Outreach Program at National Jewish Health offers a comprehensive array of services, which can be tailored to meet a company's individual needs. We are composed of occupational and environmental medicine specialists, certified industrial hygienists, epidemiologists, immunologists, biostatisticians, laboratory technologists, health educators, and contract coordinators. Working together, our multidisciplinary team provides a range of services to numerous private and government beryllium-using facilities across the U.S., including BeLPT testing, clinical evaluation, exposure sampling, medical surveillance program design or review, risk assessment, on-site and web-based beryllium education, respirator fit testing, and industrial hygiene evaluation and design.

For more information on any of our beryllium-related services, including BeLPTs , clinical evaluation services, industrial hygiene, educational presentations, and consulting, please contact us at BerylliumGroup@njhealth.org (mailto:BerylliumGroup@njhealth.org) (mailto:beryllium@njhealth.org) , or 1.800.423.8891, x1722.

## Additional Information on Beryllium

Additional information about beryllium can be found on the following web sites:

- Beryllium Biobank (http://www.ucdenver.edu/academics/colleges/PublicHealth/research/ResearchProjects/bbb/Pages/default.aspx)
- Department of Energy Current Worker Program (http://www.eh.doe.gov/be/)
- Department of Energy Former Worker Program (http://www.hss.energy.gov/HealthSafety/FWSP/formerworkermed/index.html)
- Department of Labor/Energy Employees Illness Compensation Program (http://www.dol.gov/esa/regs/compliance/owcp/eeoicp/main.htm)
- Department of Energy Office of Worker's Advocacy (http://www.eh.doe.gov/advocacy/)
- OSHA (http://www.osha.gov/SLTC/beryllium/index.html)
- National Library of Medicine: PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi)

© 2013 National Jewish Health

**National Jewish Health**

Science Transforming Life

njhealth.org Home

For Professionals

Careers

| My National Jewish Health

# Industrial Hygiene Program

**303.398.1539 |RidderA@njhealth.org (mailto:RidderA@njhealth.org)**

With more than 30 years of health and safety experience, the Industrial Hygiene Program at National Jewish Health is dedicated to the measurement and control of residential and workplace chemical and biological exposures. Our goal is to provide practical, evidence-based exposure consultation to improve the home and workplace environment. We specialize in providing customized and comprehensive programs that address specific industry needs as well as complex residential exposures. Our highly-trained and experienced staff works with clients to develop practical, cost-effective solutions.

By combining the Industrial Hygiene Program with our occupational, environmental, pulmonary, allergy and respiratory protection specialists, National Jewish Health has the expertise to provide you with comprehensive solutions that no other consultant or hospital can offer.

To schedule industrial hygiene services please call 303.398.1539 or e-mail Amy Ridder at RidderA@njhealth.org (mailto:RidderA@njhealth.org) .

## Program Personnel

- Kate Serrano, MPH, HHS (mailto:SerranoK@njhealth.org) is a Master's level industrial hygienist with extensive experience in respiratory protection, noise, and indoor air quality. She has a special interest in residential indoor air quality and is a certified healthy homes specialist.

## Industrial Hygiene Services

### Consulting

We work closely with clients to review and evaluate potential exposures. Our strength is our ability to work cooperatively with physicians to address complex chemical and biological exposures. National Jewish Health has extensive experience in providing comprehensive medical and industrial hygiene solutions in situations where current exposures may be causing worker or resident illnesses such as chronic beryllium disease, occupational asthma, bronchiolitis obliterans, and hypersensitivity pneumonitis. We also have specialized experience related to beryllium, flavoring chemical, atypical mycobacterium, methamphetamine, and mold/fungi exposures.

### Environmental Monitoring and Sampling

We use the latest technology to measure chemical and biological exposures. Our inventory of in-house monitoring equipment allows us to perform large monitoring surveys in a time-efficient manner. We have unique capabilities for measuring exposure pathways using tracer gas methods and detailed particle size analyses using an aerodynamic particle sizer. Our close relationships with commercial environmental testing laboratories allow us to offer cost-effective sampling services.

### Education and Training

We have an experienced training team that conducts training programs across the U.S. on a wide variety of occupational health and safety topics. We have received training grants from OSHA to develop training on topics such as beryllium health effects and exposure control and health effects and control of flavoring chemical exposure. All of our training programs have been developed to meet the needs of the adult learner and include hands-on or interactive training activities. We have established worker training programs meeting all OSHA standards for:

- General Respiratory Protection
- General Hazard Communication
- Use of Powered Air Purifying Respirators (PAPR)
- Use of Self-Contained Breathing Apparatus (SCBA)
- Noise and Hearing Conservation
- Healthcare Worker Exposure to Airborne Infectious Agents
- First Responder Exposure to Clandestine Methamphetamine
- First Responder Exposure to Illegal Marijuana Grow Operations
- Beryllium Health Effects and Exposure Control
- Flavoring Chemical Health Effects and Exposure Control

These programs can be delivered at the worksite or we can arrange training at an offsite location. We specialize in developing customized training solutions to meet the needs of our clients. Our unique combination of medical and exposure professionals allows us to deliver training on complex topics at a level that can be understood by the average worker.

## Hot Topics in Industrial Hygiene

The Industrial Hygiene Program at National Jewish Health specializes in providing consultation services and research for unique environments. Learn about some of our unique areas of research:

- Methamphetamine labs
  - Chemical Exposures Associated with Clandestine Methamphetamine Laboratories (pdf)
  - Methamphetamine Contamination on Environmental Surfaces Caused by Simulated Smoking of Methamphetamine (pdf)
- Mold
- Beryllium
- Indoor Air Quality

© 2013 National Jewish Health

FW: Safety Concern

From: MURFIN, ARTHUR F WG-11 USAF AFMC 533 CMMXS/MXDPBCG (arthur.murfin@us.af.mil)

To: amcoalcreek@yahoo.com

Date: Friday, December 13, 2013 at 10:22 AM MST

-----Original Message-----
From: Buhl, Richard D Civ USAF AFMC 309 CMXG/CL
Sent: Thursday, July 18, 2013 9:32 AM
To: Murfin, Arthur F Civ USAF AFMC 533 CMMXS/MXDPBCG
Subject: RE: Safety Concern

Mr. Murfin,

Thanks for the email. I appreciate you bringing this concern to me. I think we are making strides. We have corrected numerous issues that have been identified through VPP and my discussions with employees. I and the squadron directors review all VPP submissions on a monthly basis. The slow pace of change in some cases has to do with sequestration and contracting rules. I have been aggressive in working with my counterparts to try to counter the delays, but I have had limited success. I think some things take way too long to fix, but I believe we are more aggressive with shutting down unsafe workloads until we can get controls in place.

This brings me to your specific concern. I will engage with the bio and medical community to look into this issue. I will get back to you next week on a proposed way ahead.

By the way, I found the article and research to be very sobering...

V/R,

Rick Buhl
Director, 309 Commodities Maintenance Group
Hill AFB, Utah
Comm 801-777-3241
DSN 777-3241
http://www.linkedin.com/in/rickbuhl

-----Original Message-----
From: Murfin, Arthur F Civ USAF AFMC 533 CMMXS/MXDPBCG
Sent: Wednesday, July 17, 2013 7:23 PM
To: Buhl, Richard D Civ USAF AFMC 309 CMXG/CL
Subject: Safety Concern

Mr. Buhl,

A few weeks ago you came to building 510 to express your concern for the
safety of workers , the need for a change in attitude
towards safety in the work place and people who bring concerns to management's
attention. Your situation is similar to the situation
EG&G was in when they took over managing the DOE nuclear weapons plant I used

to work at. They needed to change the work environment.
When EG&G took over there already was a Joint Company Union Safety Committee. However many of the concerns seemed to
just stay open with no resolution in site. The change they made might help you change attitudes and make workers more willing to speak up and voice concerns. They beefed up the Joint Company Union safety Committee and added a commitment tracking system. If it was a commitment it was tracked and reported to senior management. It didn't matter whether the commitment was made to the EPA or the Union it was tracked.
A worker at the nuclear weapons plant could file a safety concern through the union safety committee and have union protection. I was the Safety Committee rep for Bldg. 460. The addition of the commitment tracking system worked quite well . Safety issues did not get side tracked. In my onion allowing workers to file a safety concern through the union did make them more likely to file a concern. In many cases the person would go to a union steward and the steward would file the concern which allowed the worker to remain unknown.

I have my own safety concern which I would like to bring to your attention. I am concerned about the BE copper machined at hill. The nuclear weapons plant I worked at in Colorado had many engineering and administrative controls to keep BE machinists from breathing be dust or vapors. We still had a very bad problem. The first 8 pages of the attachment to this email are an old newspaper article that tells that sad story as well as some other places that had a problem.
The last 8 pages are about National Jewish Medical and Research Center. National Jewish has more experience with the diagnosis and treatment of beryllium disease than any other group in the world. They also have an Industrial Hygiene program that will assess a company's exposure and related health risks. I think you should contact them and see what they think about what we do here at Hill. National Jewish did some studies which indicate the OSHA PEL is incorrect. The Air Force PEL most likely comes from the OSHA PEL not the National Jewish study.
Because of what I saw happen at Rocky Flats I urge you to contact national Jewish medical and Research Center and follow their recommendation
Even if it is more strict than the air Force Standard.

Respectfully,

Art Murfin

---------------------------------------------------------------

Please open the attached document. This document was digitally sent to you using an HP Digital Sending device.

smime.p7s
5.4 kB

# EXHIBIT 4

Email from Arthur F. Murfin to Dan Ober and Dennis Lange,
copied to Richard Parris and Erin Pettyjohn, “RE: Friday 29 Oct 2021,”
November 1, 2021 (with Mr. Ober’s October 29, 2021 email below it)

Murfin v. United States of America, et al., No. 1:25-cv-00664-JFR-JMR

**PLAINTIFF'S EXHIBIT 4** Exhibit 4 — Page 1 of 2

Murfin v. United States of America, et al., No. 1:25-cv-00664-JFR-JMR



RE: Friday 29 Oct 2021

From: MURFIN, ARTHUR F WG-14 USAF AFMC AFRL/RVBXB (arthur.murfin@us.af.mil)

To: daniel.ober.1@spaceforce.mil; dennis.lange.1@us.af.mil

Cc: richard.parris.1@spaceforce.mil; erin.pettyjohn.1@spaceforce.mil

Date: Monday, November 1, 2021 at 12:29 AM MDT

Dan,

You have your facts wrong. I did not claim there was nothing else to do. I said what do you think I should be doing.

Then you said "I don't know but something" Then I said" I could clean up my work bench" which I did.

You got the idea I should be doing something else besides run the Hurco from Tim. This is the only Federal Job

Tim has ever had, I am the one you has had multiple federal Navy, Army Air Force and Treasury in my 19 years of service.

You are not in the shop enough to what's going on you rely on Tim who breaks Safety rules. I don't know how you can complain about how long Tim says it took me to do a job when 1. I have to do the jobs Tim can't do. 2. Look at how long you failed to be able to get the

Hurco fixed, and the short time it took me to get it fixed. 3. It looks to me like Tim is unable to vacuum weld in spite of being sent

To welding school two half days a week for a year and a half. I hear the vacuum welding jobs are being sent out because Tim can't

Do them. If true this is Fraud and abuse. Both you and Tim have a problem with me because of that EEO complaint I files.

With Respect,

Art Murfin

**From:** OBER, DANIEL M DR-03 USSF AFMC AFRL/RVBXB <daniel.ober.1@spaceforce.mil>
**Sent:** Friday, October 29, 2021 3:36 PM
**To:** MURFIN, ARTHUR F WG-14 USAF AFMC AFRL/RVBXB <arthur.murfin@us.af.mil>
**Cc:** FELKINS, CYNTHIA S GS-12 USAF AFGSC 377 FSS/FSCA <cynthia.felkins@us.af.mil>; PARRIS, RICHARD T DR-03 USSF AFMC AFRL/RVBX <richard.parris.1@spaceforce.mil>
**Subject:** Friday 29 Oct 2021

Art,

Today we had a discussion about your level of performance in the model shop. Twice today I came by the model shop and found you sitting around doing nothing while the Hurco CNC machine was milling. The first time I came by you said that you had only been sitting there for about 20 minutes and that you thought it was ok to sit and

watch the machine while it was milling. You also said that you thought watching the machine counted as doing something. We discussed that it wasn't necessary to be watching the machine (you weren't actually watching the machine anyway, you had your back to the machine when I came in) and that you were expected to be working productively on other things while the CNC machine was milling. I asked you to think about what you could be doing while the machine was milling and that I would come back later to discuss it with you.

The second time I came by, hours later, you were again sitting around while the Hurco machine was milling. You claimed there was nothing else for you to do. I suggested you could clean up the work bench which was scattered with tools and scrap materials. I again emphasized that you were expected to be working productively on other things while the machine was milling and that sitting around was unacceptable. We discussed some ideas for what you could be doing while the CNC machine is running preprogrammed processes that takes 10s of minutes to complete. At the end of the discussion I told you that I would send you an email summarizing what we had discussed.

Regards,
Dan

Dr. Daniel M. Ober
Senior Research Physicist
Chief, Laboratory and Space Based Measurements Section

AFRL/RVBXB
3550 Aberdeen Ave SE
Kirtland AFB, NM 87117-5776

Phone: DSN 246-5749, Comm 505-846-5749
E-mail: daniel.ober.1@spaceforce.mil

# EXHIBIT 5

Email from Erin N. Pettyjohn, "Safety Mishap – Pressurized Bottle,"
July 20, 2021 (forwarded February 24, 2023)

Murfin v. United States of America, et al., No. 1:25-cv-00664-JFR-JMR

## FW: Safety Mishap - Pressurized Bottle Gas Bottle incident

From: MURFIN, ARTHUR F CIV USAF AFMC AFRL/RVBXB (arthur.murfin@spaceforce.mil)

To: amcoalcreek@yahoo.com

Date: Friday, February 24, 2023 at 08:19 AM MST

Gas Bottle incident

**From:** PETTYJOHN, ERIN N DR-04 USSF AFMC AFRL/RVB <erin.pettyjohn.1@spaceforce.mil>
**Sent:** Tuesday, July 20, 2021 8:35 AM
**To:** AFRL/RVB All Distro List <AFRL.RVB.AllDistroList@us.af.mil>
**Subject:** Safety Mishap - Pressurized Bottle

Team,
I learned yesterday of an issue with a pressurized bottle that was discovered last Friday. The bottle contained HF, and the Flourine reacts with the steel in the bottle over time, potentially increasing pressure to an unsafe level. The KAFB fire department and RV Safety was called, and they assessed the situation on Friday, with Col Felt. Those in the lab were sent home to telework until the lab was cleared. The bottle in question is ASME pressure vessel coded which allows 3 to 4 times the max allowable working pressure for a factor of safety, and rated at 2200 psi. The bottle was moved this morning at 0600 into an explosive shipping container with a burst strength of 14,677 psi, giving a factor of safety of 6.67. The container is in the compressed gas storage room until it is transported and disposed by a contractor. The lab and storage room are back to normal operations. If you have any questions or concerns, please don't hesitate to contact myself, LtCol Erik Kappe, or Mr. Mike Martin of safety.
v/r,
Erin

smime.p7s
5.3 kB

# EXHIBIT 6

Excerpts from the Report of Investigation, EEO Matter 8Y1M1901620
(ROI pages 1–5, 62, 70, 101–108, and 124)

Murfin v. United States of America, et al., No. 1:25-cv-00664-JFR-JMR

AFCARO RECEIVED MAY 12, 2020

# Privacy Act Data Cover Sheet

To be used on all documents containing personal information

## DOCUMENTS ENCLOSED ARE SUBJECT TO THE PRIVACY ACT OF 1974

Contents shall not be disclosed, discussed, or shared with individuals unless they have a direct need-to-know in the performance of their official duties. Deliver this/these document(s) directly to the intended recipient. **DO NOT** drop off with a third-party.

**The enclosed document(s) may contain personal or privileged information and should be treated as "For Official Use Only." Unauthorized disclosure of this information may result in CIVIL and CRIMINAL penalties. If you are not the intended recipient or believe that you have received this document(s) in error, do not copy, disseminate or otherwise use the information and contact the owner/creator or your Privacy Act officer regarding the document(s).** (DoD Directive 5400.11, "Department of Defense Privacy Program," November 16, 2004.)

# Privacy Act Data Cover Sheet

DD FORM 2923, DEC 2006

# INVESTIGATIVE FILE

AFCARO RECEIVED MAY 12, 2020

**8Y1M1901620**

DOCKET NUMBER

**ARTHUR MURFIN**

COMPLAINANT

**DEPARTMENT OF THE AIR FORCE**

COMPONENT FILED AGAINST

**MAY 12, 2020**

DISPATCH DATE

**WARNING**: All information contained in this Investigative File is protected by the Privacy Act of 1974 and must be dealt with accordingly.

# DEPARTMENT OF DEFENSE

HUMAN RESOURCES ACTIVITY
DIVERSITY MANAGEMENT OPERATIONS CENTER
**INVESTIGATIONS AND RESOLUTIONS DIRECTORATE**

# INDEX

Investigative File
Complaint of Arthur Murfin
Agency Number 8Y1M1901620

Page

Investigative File Index ....................3

**Section 1 – Formal Complaint Documents Submitted by Complainant**
Formal Complaint of Discrimination ....................6

**Section 2 – EEO Counseling Documents**
2.1 EEO Counselor's Report ....................9
2.2 Notice of Rights and Responsibilities ....................17
2.3 Notice of Right to File a Formal Complaint of Discrimination ....................29

**Section 3 – Claims to be Investigated**
3.1 Notice of Receipt ....................32
3.2 Notice of Acceptance ....................35

**Section 4 – Attempts at Resolution**
Reserved ....................40

**Section 5 – Appellate Activity**
Reserved ....................41

**Section 6 – Summary of Evidence**
Report of Investigation ....................42

**Section 7 – Evidence**
7.1 Testimony ....................56
- a. Complainant's Declaration ....................57
  - i. Picture of the workbench being locked ....................77
  - ii. Pictures of the collet rack and where the phone used to be ....................78
  - iii. Pictures of Mr. Myers' letter from the EEO office ....................83
  - iv. Requests for training ....................85
  - v. Master Labor Agreement re: Discipline and Counseling ....................93
  - vi. Memorandum about Regular Day Off ....................96
  - vii. Email about making the shop more efficient ....................98
  - viii. Email about the date of the feedback session ....................100
  - ix. Email with background information about Complainant's hiring ....................101
- b. Complainant's Rebuttal ....................109
- c. Declaration of Thomas Caudill ....................115
- d. Declaration of Col Eric Felt ....................131
- e. Declaration of Daniel Ober ....................141
- f. Declaration of Lt Col Gregory Izdepski ....................160
- g. Declaration of Timothy Myers ....................173

# INDEX

Investigative File
Complaint of Arthur Murfin
Agency Number 8Y1M1901620


7.2 Documentation re: Claims ....184
- a. Complainant's Position Description, WG-4714-14....185
- b. Complainant's SF-50 ....193
- c. Complainant's 2019 Performance Standards....194
- d. Emails re: Complainant's 2019 Performance Evaluation, Employee Input.....202
- e. Complainant's 2019 Appraisal ....205
- f. Comparative 2019 Performance Evaluations ....221
- g. Documentation regarding an investigation into sabotage of machinery....225

7.3 Policy Information ....226
- a. Policy 377th Force Support Squadron, New Beginnings: Appraisals ....227
- b. User Guide: Completing Key Actions in MyPerformance ....253
- c. DPMAP Frequently Asked Questions ....284
- d. MyPerformance User Guide ....292
- e. DoD Performance Management and Appraisal Program Toolkit....310
- f. DoD Civilian Personnel Management System: Performance Management and Appraisal Program ....363
- g. DoD Civilian Personnel Management System: Performance Management.....388

7.4 Organizational and Statistical Data....403
- a. Organizational Chart, January 1 – October 29, 2019....404
- b. Organizational Chart, October 29, 2019 – January 14, 2020....405
- c. Workforce Profile ....406

7.5 Miscellaneous Items....407
- a. Complainant's medical documentation and Schedule A Letter....408
- b. Complainant's prior EEO activity ....410
- c. Documentation about counseling sessions with Mr. Myers ....412
- d. Investigator's Declaration....413

7.6 Miscellaneous Processing Documents....414
- a. Letter of Authority ....423
- b. Scheduling Letter and Participant's Guide ....424
- c. All correspondence with Complainant....434
- d. All correspondence with EEO Office ....489
- e. All correspondence with the RMOs and Witnesses....511

# INDEX

Investigative File
Complaint of Arthur Murfin
Agency Number 8Y1M1901620

| |
|---|
| Agency sources provided the documents found in this file unless otherwise indicated. These documents have not been altered, unless indicated. Efforts were made to remove duplicate documents; however, duplicate documents may still exist within the case file. |

syndrome. I have to get the paperwork to see exactly what it says. I will get a copy of it and send it to you.

16. **Identify the EEO activity/ies you engaged in which resulted in the reprisal action at issue in this complaint. For each EEO activity you engaged in, identify:**

**a. the nature of the EEO activity (such as formal EEO complaint, EEO counseling activity, witness in investigation of coworker's complaint, request for reasonable accommodation, verbal complaint about discrimination against oneself or others, threatening to file a charge of discrimination);**

**b. the date of the activity;**

**c. whether and how the RMOs in the current complaint would have known of this prior EEO activity at the time of the employment action at issue.**

A: I would say it is mostly this complaint that I am being reprised against for. When I arrived here, I was supposed to show up on a Wednesday but on that Monday they pulled the job offer and I was in limbo for two or three weeks. I was suffering mentally from this and the Mint would not take me back and the Air Force would not take me either. Finally, I got ahold of the Air Force Inspector General and they put me in touch with the Inspector General at Kirtland, who told me to talk to Lt Richard Reed, who was in charge of civilian personnel on the base. I will send this to you as it will give you some background information. And he made them offer me the job and give me the back pay to the day I was supposed to get it.

I have been subjected to reprisal and discrimination by Tom Caudill and Tim Myers. I filed the complaint in December of 2019, and they were interviewed at that time. There was a Commander-Directed Investigation, when the Colonel decides if he should take some action, you can go to him and try that first and see if the problem went away. And that is how Dan Ober became my boss. There was a meeting with Col Felt. Lt Col Ipadetski (ph.) is the Deputy Chief and he was in this meeting. Col Eric Felt did the Commander-Directed Investigation. Col Felt told Dan Ober that he was going to take over the shop,and Dr. Caudill said it might take a while for this to happen and he said he would probably be giving me my performance appraisal still, and that is when he handed me the paper that said I was minimally meeting the aspects of my job. I felt this was discrimination by Dr. Caudill because previously Col Felt told me I was meeting the elements.

17. **How and when did Dr. Caudill and Mr. Myers become aware of your age?**

A: For one thing, way back when, before I took the job, I came out here to look at it so they physical saw me. Tom Caudill, as the supervisor, has my personnel records. Tim Myers has said I should retire, I am not in good shape and things like that, so obviously he has noticed my age and my medical conditions.

**47. (a) Whether the Complainant, Arthur F. Murfin, was discriminated against on the bases of age and disability (mental and physical), when:**

**5. On August 29, 2019, Thomas Caudill (Chief Geospace Technologies Division, AFRL, DR-04) did nothing as a supervisor/manager when shown Timothy Myers (Model Maker, AFRL, WG-14) had moved the Complainant's personal items (without asking).**

**48. Are these the same items Mr. Myers removed in claim 3? If not, please explain what he moved.**

A: I believe these are the same things.

**49. What did you tell Dr. Caudill, and when did you tell him?**

A: I showed him what Tim Myers had done, and how he had done these things that Dr. Caudill had told him not to do, and he did not do anything about it. He just said, well, I cannot keep coming in here and dealing with the issues between the two of you, or something to that effect. He just did not want to deal with it.

**50. What did he say he would do? Did he do it?**

A: Nothing was done. To this very moment, nothing has been done about it.

**51. Were there any witnesses to this event?**

A: No, it was just Dr. Caudill and me in the shop. It happened after Tim Myers went home.

**52. What do you believe should have happened?**

A: I think Dr. Caudill should have had a discussion with him, he should have made him put things back, and there should have been some kind of discipline, probably a suspension. He did not make him remove the lock or put the phone back which leads me to think there was also no discipline.

**53. Why do you believe your age and medical condition were factors when this happened?**

A: I think they were factors because it goes back to the holdover from the problems when I first got here and was told the job was cancelled, which was in the email I sent to Lt Col Reed and which mentioned my age and medical condition. I will send it to you.

**54. (a) Whether the Complainant, Arthur F. Murfin, was discriminated against on the bases of age and disability (mental and physical), when:**

**Subject:** FW: Commander worked or directed investigation
**From:** "MURFIN, ARTHUR F WG-14 USAF AFMC AFRL/RVBXB" <arthur.murfin@us.af.mil>
**Date:** 3/9/2020, 1:50 PM
**To:** Leigh Dempsey <ldempsey@dszonline.com>

Ms. Dempsey,

Below is an email to Col. Felt which contains the email to Lt Col. Richard Reed. This should provide you with the Background information so you know I have had a problem since before I came to Kirtland AFB. It also has the date of my meeting with Col. Felt.

Respectfully,

Art Murfin

**From:** MURFIN, ARTHUR F WG-14 USAF AFMC AFRL/RVB
**Sent:** Tuesday, September 17, 2019 8:03 AM
**To:** FELT, ERIC J Col USAF AFMC AFRL/RV <eric.felt@us.af.mil>
**Subject:** RE: Commander worked or directed investigation

Col. Felt,

Thank you for your response to my email. I emailed Capt. Hilburn and an appointment has been scheduled for Thursday September 26,2019 2:30 PM-3:30 PM.

My Problems here at AFRL go back to before I was employed here, were it not for Lt. Col. Richard Reed
I don't know what would have happened to me.

I look forward to our meeting a week from this Thursday.

Respectfully,

Art Murfin

----- Forwarded Message -----
**From:** "Art Murfin" <amcoalcreek@yahoo.com>
**To:** "richard.reed.4@us.af.mil" <richard.reed.4@us.af.mil>
**Cc:**
**Sent:** Thu, Aug 24, 2017 at 2:49 AM
**Subject:** Fw: Murfin Matter Air Force 3 days admin leave per Caudill no 71 fill out when I get there
Col. Reed,

I received a tentative job off back in Oct. 2016 from the Air Force for a job at Kirtland AFB.
I visited Tom Caudill and the shop I was going to work in july 12, 2017 at my own expense
I received a Firm Job offer July 21,2017
I accepted the Firm Job offer July 23, 2017
It was my understanding I was to receive three days of admin leave for the purpose of
moving from Alameda CA to Albuquerque NM. ( see emails below)
That would have been August 10 , 2017.

000101

On Monday August 7, 2017 The Job offer was recinded.
This was after I had left my federal goverment job at the US Mint in San Francisco CA.

I would have had 15 years of Federal service in December 2017. Now i may not even be able to retire with full benefits. I wanted to work five more years.

I am shocked that people who hold Top Secret Security Clearances would behave so unethically.

I believe set up by Caudill and others because of my age. They wanted to eliminate me so they could hire a younger person. Remember they saw me July 12th.

I believe the below emails are enough to show you I am telling the truth which is more than can be said for some Kirtland Air Force civilians with Top Secert Clearances.

There are of couse many more emails and there were a few phone conversations.

Tom Caudill did send me an email Friday Aug 4, 2017 stating I had to take the admin leave after I was there. What pupose does that serve? Is it reasonable on Aug. 4th to tell someone over 1,000 mile away that you are moving their report date from Aug. 10 to Aug. 7, 2017? I don't think so.
Is it ethical to do that? I don't think so. By the way Tom Caudill's change the deal email was in response to an email I sent him. If I wouldn't have sent that email I might not have found out They recinded the job offer until I was at the Kirtland gate trying to get in.

I talked to a lawyer who said this is breach of contract and said he would send a letter on my behalf and asked me for a contact to send it to. Which got me to reading the AF IG web page.

In reading on the Air Force IG web page it states that if you contact the local IG many times they can resolve your issue. That is what I am hoping will happen.
I am hopping you will see this is wrong and fix it so I don't have to have litigation.

Respectfully,

Art Murfin

--- On Tue, 8/22/17, Art Murfin <amcoalcreek@yahoo.com> wrote:

> From: Art Murfin <amcoalcreek@yahoo.com>
> Subject: Murfin Matter Air Force 3 days admin leave per Caudill no 71 fill out when I get there
> To: Joshua.Quigley@mail.house.gov
> Date: Tuesday, August 22, 2017, 6:34 PM
> --- On Tue, 8/22/17,

> wrote:
>
> > From:

> > Subject: Fw: New EOD Leave
> information
> > To: amcoalcreek@yahoo.com
> > Date: Tuesday, August 22, 2017,
> 6:18 PM
> >
> >

000102

> > ---------- Forwarded Message
> ----------
> > From: "CAUDILL, THOMAS R DR-04
> USAF AFMC AFRL/RVB"
> > <thomas.caudill@us.af.mil>
> > To: "Murfin, Arthur"
> > <Arthur.Murfin@usmint.treas.gov>,
> > "

> > Cc: "GARCIA, JANELLE A CTR USAF
> AFMC AFRL/RVB"
> > <janelle.garcia.2.ctr@us.af.mil>,
> "DOBBS, LESLEY
> > GS-09 USAF AFMC AFRL/RVOR"
> > <LESLEY.DOBBS@us.af.mil>
> > Subject: New EOD Leave
> information
> > Date: Thu, 27 Jul 2017 23:17:46
> +0000
> >
> > Art,
> >
> > I'm not sure we need it, but you
> can fill out the OPM 71
> > once you arrive. Lyndsay Strong
> works in the Base
> > finance office, I believe, but I
> don't know her.
> >
> >
> > The Kirtland Inn number is
> 505-846-9653. The only
> > email address I could find is
> > lodging.reservations2@us.af.mil
> but that may not be specific
> > to Kirtland. Another alternative
> is the FamCamp.
> > Their number is 505-846-0337.
> It is by the
> > Eubank gate, easy to spot.
> 0730-1630, M-F. Let
> > me know if there is any other
> information I can provide.
> >
> > Tom
> >
> > -----Original Message-----
> > From: Murfin, Arthur [mailto:Arthur.Murfin@usmint.treas.gov]
> >
> > Sent: Thursday, July 27, 2017
> 12:04 AM
> > To: CAUDILL, THOMAS R DR-04 USAF
> AFMC AFRL/RVB

> > <thomas.caudill@us.af.mil>;

> > Cc: GARCIA, JANELLE A CTR USAF
> AFMC AFRL/RVB
> > <janelle.garcia.2.ctr@us.af.mil>;
> DOBBS, LESLEY GS-09
> > USAF AFMC AFRL/RVOR <LESLEY.DOBBS@us.af.mil>
> > Subject: [Non-DoD Source] RE: New
> EOD Leave information
> >
> > Tom,
> >
> > Thank you for the information. Do
> I need to fill out the OPM
> > 71 for the three day admin leave?
> > Jordan said in his email that
> there would be forms I would
> > be emailed to fill out before
> arriving at Kirtland.
> > He said Lyndsay Strong would be
> the in processing contact
> > person. Do you know Ms. Strong?
> > You are the only one who has
> emailed me since accepting the
> > Firm offer.
> >
> > FYI the RV space that Van Cleave
> Place said they were
> > holding for me has been rented.
> > I have been trying to contact the
> Air Force Inn on base to
> > see if I can stay there when I
> first arrive.
> > I have not been able to get anyone
> to answer the phone. Do
> > you have a contact number for them
> or email address?
> >
> > Art Murfin
> >
> >
> > -----Original Message-----
> > From: CAUDILL, THOMAS R DR-04 USAF
> AFMC AFRL/RVB
> > [mailto:thomas.caudill@us.af.mil]
> > Sent: Wednesday, July 26, 2017
> 12:59 PM
> > To: Murfin, Arthur <Arthur.Murfin@usmint.treas.gov>;
>
> > Cc: GARCIA, JANELLE A CTR USAF
> AFMC AFRL/RVB
> > <janelle.garcia.2.ctr@us.af.mil>;
> DOBBS, LESLEY GS-09

> > USAF AFMC AFRL/RVOR <LESLEY.DOBBS@us.af.mil>
> > Subject: RE: New EOD Leave
> information
> >
> > Art,
> >
> > I can answer the questions you
> asked Lesley.
> >
> > We are not on a general AWS
> schedule. AWS can be
> > approved but there is a process
> you have to go through
> > before you can start working it.
> So, even if you were
> > on an AWS, August 11 would not
> necessarily be an off day,
> > because the schedule can be varied
> slightly depending on the
> > situation (i.e. supervisors
> balancing the number of people
> > off on any given day).
> >
> > Yes, you do get three admin leave
> days, but you will
> > need to in-process on Monday
> morning and then take off
> > Monday afternoon, Tuesday,
> Wednesday and Thursday morning or
> > in-process on Thursday morning.
> Either way you have to
> > in-process to be paid for your
> first week because timesheets
> > are due on the 16th.
> >
> > Whatever you decide to do, you
> will need to let me know
> > because I am your first-line
> supervisor, so I have to
> > approve any leave or absence on
> the OPM 71.
> >
> > Let me know if there is anything
> else you need to know.
> >
> > Tom
> >
> > -----Original Message-----
> > From: DOBBS, LESLEY GS-09 USAF
> AFMC AFRL/RVOR
> > Sent: Wednesday, July 26, 2017
> 6:41 AM
> > To: GARCIA, JANELLE A CTR USAF

000105

> AFMC AFRL/RVB
> > <janelle.garcia.2.ctr@us.af.mil>
> > Cc: Murfin, Arthur <Arthur.Murfin@usmint.treas.gov>;
> > amcoalcreek@yahoo.com
> > Subject: FW: New EOD Leave
> information
> >
> > Janelle
> >
> >
> >
> > Mr. Murfin emailed me (see below),
> can I please ask for you
> > to touch base with him to resolve
> his question.
> >
> >
> >
> > Thank you
> >
> >
> >
> > Very respectfully,
> >
> >
> >
> > Lesley Dobbs
> >
> > Personnel Services Support
> Specialist
> >
> > AFRL/RVOR
> >
> > 3550 Aberdeen SE
> >
> > Kirtland AFB NM 87117
> >
> > ¢ÏComm: 505-853-6518
> >
> > ¢ÏDSN: 263-6518
> >
> > Email: lesley.dobbs@us.af.mil
> >
> >
> >
> > From: Murfin, Arthur
> > [mailto:Arthur.Murfin@usmint.treas.gov]
> > Sent: Monday, July 24, 2017 10:24
> PM
> > To: DOBBS, LESLEY GS-07 USAF AFMC
> AFRL/RVOR
> > <LESLEY.DOBBS@us.af.mil>
> > Subject: [Non-DoD Source] New EOD

000106

> >
> >
> >
> > Good Morning,
> >
> >
> >
> > Are you back from vacation yet?
> >
> >
> >
> > A new EOD date has been set Aug.6,
> 2017
> >
> >
> >
> > I need information so I can fill
> out the OPM 71 form you
> > sent me. I believe you are on AWS
> correct.
> >
> > Is Friday Aug. 11, 2017 an AWS day
> off at Kirtland? What are
> > the work hours for the purpose of
> filling out the
> >
> > OPM 71?
> >
> >
> >
> > I believe I get three days of
> admin leave to move correct?
> > That would be Monday Tuesday
> Wednesday.
> >
> >
> >
> > Respectfully,
> >
> >
> >
> > Art Murfin

**From:** FELT, ERIC J Col USAF AFMC AFRL/RV <eric.felt@us.af.mil>
**Sent:** Thursday, September 12, 2019 8:16 PM
**To:** MURFIN, ARTHUR F WG-14 USAF AFMC AFRL/RVB <arthur.murfin@us.af.mil>
**Subject:** RE: Commander worked or directed investigation

Art,

Thank you for reaching out to me. I would like for RV to be a workplace where every individual is treated with dignity and respect and doesn't need the EEO process, but I'm glad it is there for situations that fall short of my expectations.

FW: Commander worked or directed investigation

The way the Commander worked issues process works is that you can choose to meet with me to discuss your concerns. I'll investigate your concerns, formally and/or informally as appropriate, and attempt to resolve them. If you are not satisfied, you can still pursue a formal EEO complaint through the EO office. The program is a quick and informal way to quickly fix some situations. I like the program because it is a much faster than the formal EEO process. When discrimination has occurred, correcting the inappropriate or illegal behavior as quickly as possible is in everyone's best interest. Unfortunately the formal EEO process can take many years to reach conclusion.

If you would like to pursue this option please contact my exec, Capt Eddie Hilburn, to schedule a time for us to meet and discuss your concerns. I'm out of the office until the 22nd, but we could meet that week.

VR,
Eric

**From:** MURFIN, ARTHUR F WG-14 USAF AFMC AFRL/RVB <arthur.murfin@us.af.mil>
**Sent:** Thursday, September 12, 2019 9:25 AM
**To:** FELT, ERIC J Col USAF AFMC AFRL/RV <eric.felt@us.af.mil>
**Subject:** Commander worked or directed investigation

Col. Felt

Yesterday I filed an EEO complaint against Tom Caudill, Tim Myers and Barry Bun. The EEO staff informed me that there is something called
a Commander worked or Directed investigation. I would like to know how that works. Please let me know how that process works.

Respectfully,

Art Murfin

000108

talked to Tim Myers later on about trying to get along, too, although I think I had forgotten about the personal items being moved by the time I got around to talking to him.

40. **Complainant believes you should have had a discussion with Mr. Myers and made him put the things back, and there should have been some kind of discipline because you had told him about these things in the past, but you did not make him remove the lock or put the phone back or do anything else. Please respond.**

A: Again, I did make him remove the lock, but I was not in there checking that lock every week to make sure it had not been put back. The issue between the two of them is really a personality conflict, both want to do things their own way and they just do not mesh well. I do not know what I can do about that; I cannot move one of them somewhere else, we only have one machine shop. And I cannot be in there eight hours a day watching them. Complainant's opinion about what the appropriate action should be, I will never live up to his standard or Mr. Myers' to make them work better together, each has their own opinion about the way things should be done. I have tried to be fair to both of them. Mr. Myers has been in my office complaining many times, too, he just has not filed a complaint. I have always counseled him on what to do not to exacerbate the situation. I have never gone on Complainant's opinion and disciplined Mr. Myers and I have never gone on Mr. Myers' opinion and disciplined Complainant either. I did not see most of what happened, so how can I discipline either of them, especially when I find out some of these details after that fact.

41. **Complainant explained that when he first arrived, he was told the job was cancelled and he sent an email to Lt Col Reed to get the situation resolved. In this email, he mentioned his age and medical condition. He believes you did nothing as a supervisor/manager when shown Timothy Myers had moved his personal items because of his age and medical condition. Please respond to Complainant's allegation that his age and medical condition were factors when this happened.**

A: I do not know who Lt Col Reed is. I would never have seen that email.

42. **(a) Whether the Complainant, Arthur F. Murfin, was discriminated against on the bases of age and disability (mental and physical), when:**

    6. **On September 11, 2019, Timothy Myers (Model Maker, AFRL, WG-14) stated to the Complainant, "I am going to get rid of you within the year."**

43. **Complainant indicted he realizes it is his word against Mr. Myers' word, but he attests Mr. Myers said this and he believes it was related to his comments about him spending too much time in the restroom and he believes it is also related to Mr. Myers telling him he is not in good shape. Do you have any knowledge of these comments? If so, please explain.**

# EXHIBIT 7

Plaintiff's October 8, 2026 Email to Defense Counsel, Mailbox Arrival Notice, and Automatic Out-of-Office Reply

Murfin v. United States of America, et al., No. 1:25-cv-00664-JFR-JMR

## Letter came today

From: Art Murfin (amcoalcreek@yahoo.com)

To: peter.haynes@usdoj.gov

Date: Thursday, October 8, 2026 at 11:40 PM MDT

Hello Peter,

My mailbox company sent me a email today that I had mail from you. It was postmarked Oct 1 and arrived sometime in the afternoon today
Oct 8. I printed out the email I received from my mailbox company so you can see when it arrived. I am quite sure that it really arrived today
because I had ordered auto parts from Rock Auto which arrived today also but not buy US postal mail.
I went down and picked them up mid afternoon. The mail clerk checked to make sure nothing else had come in, saw her do it. Then apparently later this afternoon your letter arrived.

I will go down tomorrow and pick it up however I probably won't get back home until after you have left work,
I try to make my trips to town count gas prices being what they are.

1. I do not object to you needing more time to file your answer to my amended complaint.

2. If you need more time to submit your discovery response I do not object.

3. If you think it would be wise to vacate and reschedule the status conference currently set for Oct. 15
I do not object.

With Respect,
Art Murfin

Rock Auto Parts arrived 10-8.pdf
505.7 kB

Mailbox email recieved after 4.pdf
398.2 kB

New Mail

From: iPostal1 (admin@ipostal1.com)

To: amcoalcreek@yahoo.com

Date: Thursday, October 8, 2026 at 04:28 PM MDT

## New Mail

## Colorado Mail Services

Dear Arthur

You have received a new mail item in your Colorado Mail Services Digital Mailbox #1031!

**Details**

**Mail Item(s)**
M11357 Date: Thursday, October 08, 2026

**To view your full mailbox contents:**

**View Mail**

Thank you,
Online Customer Service

Colorado Mail Services
300 Nickel St

Ste 11
Broomfield, CO 80020
Tel: +17203727119

Make sure you continue to receive our emails. Please add cm@shipcomail.com to your Safe Sender, White List, or Address Book.

Please do not reply directly to this email. If you need help: Contact Us

You have received this email as a registered user of iPostal1.com.

iPostal1.com +1-845-579-5770 Privacy Policy Terms of Service

Don't like these emails? Unsubscribe.

Powered by iPostal1.com

Automatic reply: [EXTERNAL] Letter came today

From: Haynes, Peter (USANM) (peter.haynes@usdoj.gov)

To: amcoalcreek@yahoo.com

Date: Thursday, October 8, 2026 at 11:43 PM MDT

Hello - I'm out of the office returning October 25. If you need a response before then, please email Deputy Civil Chief Erin Langenwalter at erin.langenwalter@usdoj.gov. Thank you.

FedEx

TO REUSE: Mark through all previous shipping labels and barco... l here.

ORIGIN ID:QBFA (303) 217-0266
ARTHUR MURFIN

300 NICKEL STREET
SUITE 11
BROOMFIELD, CO 80020
UNITED STATES US

SHIP DATE: 12OCT26
ACTWGT: 0.85 LB
CAD: 6570267/ROSA2710

TO US DISTRICT COURT, DISTRICT OF NM
OFFICE OF THE CLERK
333 LOMAS BLVD. N. W.
SUITE 270
ALBUQUERQUE NM 87102
(000) 000-0000 REF:
INV:
PO: DEPT:

FedEx Express E

TRK# 0201 8785 5990 1197

TUE - 13 OCT 5:00P
STANDARD OVERNIGHT

XS ONMA

87102
NM-US ABQ

Part # 156297-435 RRDB EXP 09/27

Reusable En...

...ecycle me.

4866 TUE 10/13 07:49
333 LOMAS BLVD NW
87102-2274-70
ALBUQUERQUE,NM
527-8542
ETP-7 SP-PD-100-Y

Align bottom of peel-and-stick airbill or pouch here.